### UNITED STATES v. WHITING et al.

#### (District Court, D. Massachusetts. March 23, 1914.)

#### Nos. 453 and 454.

1. MONOPOLIES (§ 31*) — INDICTMENT — RESTRAINT OF TRADE — PRICE AGREEMENT.

An indictment alleging that the defendants, who bought 86 per cent. of the milk sold in specified country districts by the producers there for shipment to Boston and vicinity and Worcester, engaged in an unlawful combination in undue restraint of trade by agreeing upon the prices which they would pay for milk at the country points, thereby eliminating competition as to price between the defendants, held to show a combination which was prima facie unreasonably extensive and therefore illegal.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

2. MONOPOLIES (§ 31*)—COMBINATION IN RESTRAINT OF INTERSTATE TRADE—INDICTMENT.

An indictment, which charges a combination in restraint of interstate trade in milk, and which alleges that defendants combined to eliminate competition between themselves as to the price of milk purchased for resale in Boston and Worcester, and that the milk purchased by them was purchased in Maine, Vermont, New Hampshire, Connecticut, and Massachusetts, is not defective for failing to allege a restraint of interstate trade

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in milk, merely because it does not allege what proportion of the milk purchased under the combination came from outside Massachusetts, since the milk purchased in Massachusetts was purchased for the purpose of adding it to milk forming a part of interstate commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

3. MONOPOLIES (§ 29*)—ANTI-TRUST ACT—REASONABLE RESTRAINT OF COMPETITION DEFINED.

Under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), there must be not only a restraint of trade, but an undue restraint to support a conviction for combining in restraint of trade, and, to make a restraint unreasonable, it must appear either that the normal volume of interstate trade has been interfered with by artificial agencies affecting to a substantial degree, and to the disadvantage of the public, the price or supply of the commodity, which is the subject of the restraint, or that by means of a combination the price or supply of the commodity is or may be affected to a substantial extent to the disadvantage of producers or purchasers thereby operating to a material degree to the injury of the public, or that there has been a direct and intentional interference with the transportation of commodities in interstate commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. § 29.*]

4. MONOPOLIES (§ 31*)—ANTI-TRUST ACT—CRIMINAL OFFENSES—LIMITATIONS ON RIGHT OF COLLECTIVE BARGAINING.

Three classes of persons consisting of different individuals were under the control of the individual members of each class. They formed a combination by agreeing to offer and pay no more than a specified price for milk for resale in interstate commerce. The several persons were not guilty of any illegal purpose or of any oppressive methods, and, except as to price, they were free to compete with each other. The price of milk to the producers was lowered by reason of the combination, but to what extent was not shown. Eighty-six per cent. of the business of buying milk sold in designated localities for resale elsewhere after interstate transportation was in their hands. *Held*, that whether the combination was an unreasonable restraint of interstate trade, in violation of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), was for the jury.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

5. MONOPOLIES (§ 29*)—ACTS CONSTITUTING "MONOPOLY."

A "monopoly" at common law, and under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), implies a control of goods or service which the public desires, and an attempt to monopolize is an attempt to obtain control of an industry by means which prevent others from engaging in fair competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. § 29.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

6. MONOPOLIES (§ 8*)—"RESTRAINT OF TRADE."

While there can be no monopoly which is not an unreasonable restraint of trade, there may be unreasonable restraints of trade which are not monopolies.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*]

7. MONOPOLIES (§ 29*)—ACTS CONSTITUTING MONOPOLY.

Persons engaged in the business of buying milk and selling it at retail in designated localities formed a combination whereby they agreed not to offer or pay more than a specified price for milk purchased by them for

resale. It did not appear that the combination in any way enlarged their control of the business, either by forcing down the price at which they bought, so that they could undersell competitors in the selling market or otherwise. The agreement was made with the intent to wrong the public and to oppress and limit the rights of milk producers by depriving them of the higher price of milk which would have resulted from free competition. They did not dominate or control the markets in which they sold their milk purchased pursuant to the combination. *Held*, that they were not guilty of attempting to monopolize trade in milk in violation of the Sherman Anti-Trust Act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. § 29.*]

8. MONOPOLIES (§ 31*)—CONSPIRACY IN RESTRAINT OF TRADE—ELEMENTS.

An indictment charging a conspiracy in restraint of trade in violation of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) must allege facts warranting a finding that the restraint was unreasonable, and an indictment charging a conspiracy in restraint of trade in milk, which does not show the percentage of milk bought by defendants for shipment and sale in designated markets, nor allege facts from which it could be inferred that defendants either controlled or were dominating factors in any branch of the milk business, was demurrable for failing to allege an unreasonable restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

Isaac Whiting and others were indicted for violating the Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). Demurrers to indictments sustained in part and overruled in part.

William S. Gregg, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

Samuel J. Elder, of Boston, Mass., and John F. Cusick, of Boston, Mass., for defendants Whiting

Whipple, Sears & Ogden, of Boston, Mass., for defendants Hood.

Sughrue & Chase, of Boston, Mass., for defendant Graustein.

George W. Anderson, of Boston, Mass., for defendant Hunter.

MORTON, District Judge. These are two indictments against the same defendants for violating the Sherman Anti-Trust Law (26 Stats. 209). Indictment numbered 454 will be first considered. It is in two counts; the first charging a combination in restraint of· trade, the second an attempt to monopolize trade and commerce in milk.

The allegations of the first count are, in substance, as follows:

The defendants Isaac Whiting, George Whiting, John K. Whiting, Charles H. Hood, Edward J. Hood, and William Graustein were, between May 26, 1905, and May 26, 1911 (when the indictment was found), continuously, willfully, knowingly, and unlawfully engaged in a combination in undue restraint of trade and commerce among the several states of the United States, by consulting, planning, and agreeing together in the combination hereinafter described in undue restraint of trade, which combination has restrained interstate trade in the manner set forth, and has been with unlawful intent.

The combination is described as follows:

Throughout the period specified, "a very extensive industry" has been carried on in and from the states of Maine, Vermont, New Hampshire, Massachusetts, and Connecticut, involving the *purchase* at divers places in said states of milk from the producers there, and the *shipment* of the milk so purchased to Boston and vicinity and to Worcester, and the *sale* thereof to various persons; 86 per cent. of all the milk purchased in the states above named, and so shipped to, and sold in, Boston and vicinity and in Worcester, has been purchased, shipped, and sold by three classes of persons, namely, the Whiting class (consisting of the above-named defendants by the name of Whiting), the Hood class (consisting of the above-named defendants by the name of Hood), and the Graustein class (consisting of the above-named defendant Graustein). These classes were under the control of the individual members thereof. In carrying on said industry the defendants shipped from the states named, to the points named, the milk so purchased by them. The Whiting class made purchases from producers at about 128 places throughout said states and shipped the milk so purchased to Boston and vicinity; the Hood class, at 142 places throughout said states, and shipped the milk so purchased to Charlestown, Forest Hills, and Lynn; and the Graustein class, at 92 places, and shipped the milk so purchased to Charlestown. The defendants, as a necessary feature of said industry, have respectively been carrying on interstate trade and commerce. Each class, had it not been for the unlawful combination between them in restraint of trade, would have been affected by the competition of the two other classes in the purchase of milk, and the producers who sold to the defendants would have benefited by such competition. No one class of the defendants had or controlled a majority of said interstate trade in milk, but all of the classes working together did have a majority of that trade, namely, 86 per cent. thereof. Of this 86 per cent., the Whiting class controlled 48 per cent., the Hood class 44 per cent., the Graustein class 8 per cent. The defendants directed and controlled this 86 per cent. of the milk trade by and through certain copartnerships and corporations of which they were the actual and real managers. The purpose of this unlawful combination was to eliminate competition between the defendants in the purchase of milk from the producers.

The methods by which the defendants accomplished the objects of their unlawful combination and, by agreement between them, knowingly and unlawfully restrained interstate trade, is described as follows:

The different classes of defendants have, in pursuance of said agreement and combination between them to that end, refrained from competing with each other in the purchase of milk at the places named throughout the states aforesaid, and have conferred and agreed upon uniform prices to be paid by them each six months to the producers of milk for milk so purchased. The defendants, being extensive purchasers of milk, have been able, by reason of said unlawful agreement and combination, to purchase, and in fact have purchased, their milk at prices, in the making of which competition has been greatly restricted, and which have been much lower than would have been the case had said

agreement and combination not existed and had there been competition among the said classes of defendants with each other. The defendants entered into and carried out the agreement and combination described "with the intent to wrong the public and oppress and limit the rights of the milk producers in the states aforesaid by depriving said producers of the higher prices for milk which would have resulted from free and open competition among said defendants, all as aforesaid."

Second count:

The second count is against the same defendants. It incorporates by reference the circumstances and conditions set forth in the first count, and charges that the defendants, by engaging in the unlawful combination described in the first count, "did knowingly attempt to monopolize part of the trade and commerce" among said states, "with the intent to wrong the public and to oppress and limit the rights of the milk producers in the states aforesaid by depriving said producers of the higher prices for milk which would have resulted from free and open competition among said defendants, all as aforesaid."

The gravamen of both counts is a combination among the buyers of milk to eliminate competition inter se as to price only, and thereby to injure persons who had milk for sale.

It will be noticed that the scope of this indictment is narrower than in any previous case under the Sherman Act. Its omissions are significant. It does not undertake to describe conditions in the milk business generally, either in the country or the city districts. It relates only to milk which is (a) bought at specified places in country districts, (b) for shipment to and sale in the vicinity of Boston or Worcester. It does not allege the total amount of milk produced and sold at the country places named, nor the total amount shipped therefrom, nor that sale for shipment to Boston or Worcester is the principal, or even an important, market for producers of milk at said places; nor is it alleged that the prices paid there for Boston or Worcester milk established or influenced other prices in the country markets. For example, if at any given place 1,000 gallons of milk were produced, 500 gallons of it might be sent to Springfield, 400 delivered to local creameries or consumers, and 100 sold for shipment to Boston or vicinity. The alleged combination affected only this last amount of 100 gallons. According to the indictment, only 86 gallons out of the 1,000 in the case supposed were bought and shipped by the defendants, i. e., an unimportant portion of the whole amount. The same may be true as to every place mentioned in the indictment; the Boston and Worcester trade, though "very extensive," may take but a small portion of the entire amount produced, and the price of the Boston and Worcester milk may not affect prices generally in the country markets.

It is not alleged that the defendants dominated or controlled the markets where they sold their milk; for aught that appears, they may have been unimportant factors therein. The indictment thus entirely fails to allege a domination or control of prices by the defendants, either in the buying trade in the country, considered as a whole, or in the selling trade in the cities. It does, however, show such domination of

the buying trade in what is large enough to constitute a "very extensive industry."

No acts are alleged on the part of the defendants calculated to suppress competition from other purchasers, and no unfair or dishonest practices towards producers or consumers, unless the agreement in question be so regarded. It is not alleged that the prices agreed upon or paid were unreasonably low, but only that they were less than would have been the case had said restrictive agreement not been made. In this respect the present case is very different from the Nash Case (Nash v. U. S., 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232), the Swift Case (Swift v. U. S., 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518), and the Patterson Case (U. S. v. Patterson [D. C.] 201 Fed. 697).

As to most, if not all, of the places named at which milk was bought, the indictment shows that only one of the classes of purchasing defendants bought there, and it is not alleged that at such points there ever was competition in purchasing by the other two classes of defendants, though it is alleged that there would have been such competition had the agreement covering prices never been made, and that the prices paid at such points were affected by the agreement and were less than would otherwise have been paid. For aught that appears to the contrary, the different classes of defendants may always have operated in distinct and separate districts, without competition among themselves, and have continued so to operate.

It may be true that, in the country places mentioned in the indictment, the most advantageous way to dispose of milk is to sell it for the Boston and Worcester market; that it is impracticable for individual producers to ship milk to Boston or Worcester; and that the three classes of defendants, by establishing prices which they would pay, practically dominated the country market. But that is not the situation described in this indictment.

[1] Each of the defendants has demurred and each has assigned many grounds of demurrer. So far as they are merely formal or technical, they seem to me not well founded. I regard the indictment as sufficient in its technical and formal aspects, and as sufficiently informing the defendants of the offenses with which they are charged.

The defendants contended that the Sherman Act is so indefinite and uncertain as to be unconstitutional as a criminal statute. But this point has been settled otherwise since the arguments, by the decision of the Supreme Court in Nash et al. v. U. S., supra.

[2] The defendants also contended that the alleged agreement, dealing as it does only with the purchase of milk at the places named, did not directly affect or restrict interstate commerce. It was pointed out by them that the indictment nowhere alleges what proportion of the milk purchased under said agreement comes from outside Massachusetts. These objections seem to me unsound. The indictment charges a combination with respect to a well-defined trade in milk between Boston and vicinity and Worcester, and several different states; Massachusetts being one of them. It alleges a general agreement with respect to prices in the states of Maine, New Hampshire, Vermont, Massachusetts, and Connecticut. The milk was purchased for the purpose

of adding it to an existing current of interstate trade. The purchases in Massachusetts were made in accordance with a broad plan extending beyond the borders of that state. A similar objection was raised by the defendants in U. S. v. Reading Co. et al., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, and was there held unsound.

"Much of the coal so bought," it is said, "was sold in Pennsylvania, and all of the contracts were made in that state, and the coal was also there delivered to the buying defendants. * * * The mere fact that the sales and deliveries took place in Pennsylvania is not controlling when, as here, the expectation was that the coal would, for the most part, fall into and become a part of the well-known current of commerce between the mines and the general consuming markets of other states." Lurton, J., U. S. v. Reading Co., supra.

See, also, Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Montague v. Lowry, 193 U. S. 38, 45, 46, 24 Sup. Ct. 307, 48 L. Ed. 608.

Various other minor objections were made to the indictment; but upon the construction which I have given it, none of them is, in my opinion, well founded, or of sufficient importance to require discussion.

[3, 4] The crucial question, as it seems to me, is whether what the defendants are charged with having done constitutes a crime. Does the Sherman Act forbid an agreement among a substantial portion of the buyers in a certain interstate industry as to the price which they will offer or pay for a specified commodity? To reverse the question, is an agreement between a substantial proportion of the farmers in a given district, as to the price which they will charge middlemen engaged in interstate commerce for their milk, an unlawful combination, in the entire absence of any illegal purpose, or of any oppressive methods, or of any unreasonably high price? To what extent have competitors in interstate business the right to agree upon prices and eliminate competition inter se in respect thereto for their common advantage or protection?

It will be noticed that the indictment discloses no community of interest among the defendants, no general combination between them, no joint action for the purpose of coercing or injuring outsiders, but merely an agreement as to the price which they will offer and pay for milk; and that, except as to price, the defendants are free to compete with each other. It is not alleged that the exact prices agreed upon by the defendants became effective or were accepted by the sellers. The statements in the indictment as to the effect of the alleged combination are very guarded, and aver only that the price of milk to the producers was in fact lowered by reason of it. To what extent it was lowered is not alleged, nor, as before said, is it charged that the price agreed upon and paid by the defendants to the producers was unfair or oppressive; and it is nowhere explicitly stated that the sellers were under any sort of compulsion to deal with the defendants. Such compulsion is to be inferred, if at all, from the character and natural results of the alleged combination.

It may be said at once that the case is an exceedingly difficult one; and that the principles upon which it should be decided are by no means clearly settled. Change of opinion concerning the law involved

led the United States Supreme Court greatly to modify, if not to over-rule, two of its comparatively recent decisions. See comment on Freight Association & Joint Traffic Cases by White, C. J., Standard Oil Co. v. U. S., 221 U. S. 64, 67, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. And differences of opinion concerning it have occasioned vigorous dissents by members of that court and irreconcilable decisions among other courts. U. S. v. Trans-Missouri Freight Association, 166 U. S. 290, 343, 17 Sup. Ct. 540, 41 L. Ed. 1007; Northern Security Co. v. U. S., 193 U. S. 364, 24 Sup. Ct. 436, 48 L. Ed. 679; Continental Wall Paper Co. v. Voight, 212 U. S. 267, 29 Sup. Ct. 280, 53 L. Ed. 486; Central Shade Roller Co. v. Cushman, 143 Mass. 353, 9 N. E. 629 (compare Blount Mfg. Co. v. Yale & Towne Mfg. Co. [C. C.] 166 Fed. 555); People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690 (compare Skrainka v. Scharringhausen, 8 Mo. App. 522); Nester v. Continental Brewing Co., 161 Pa. 473, 29 Atl. 102, 24 L. R. A. 247, 41 Am. St. Rep. 894 (compare Anheuser-Busch Brewing Ass'n v. Houck, 27 S. W. 692).

Whether an agreement restrains trade is a matter of law for the court to determine. Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Joyce on Monopolies, § 103 (collecting authorities).

That the alleged agreement not only restrained competition, but also restrained trade, seems clear. Northern Securities Co. v. U. S., 193 U. S. 338 et seq., 24 Sup. Ct. 436, 48 L. Ed. 679; Dr. Miles Medical Co. v. Park & Sons, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 238, 20 Sup. Ct. 96, 44 L. Ed. 136; More v. Bennett, 140 Ill. 69, 29 N. E. 888, 15 L. R. A. 361, 33 Am. St. Rep. 216; People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609; The Legal Aspect of Monopoly, 20 Harv. Law Rev. p. 176 et seq. But that of itself, whatever may be the case at common law (as to which see U. S. v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; s. c, 175 U. S. 211, 238, 20 Sup. Ct. 96, 44 L. Ed. 136; Joyce on Monopolies, § 89; and Harding v. Am. Glucose Co., 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189, elaborate notes collecting authorities), is not sufficient to warrant a conviction under the Sherman Act. Under this statute there must be not only a restraint of trade, but an undue restraint. In the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, it was held, in substance and effect, that the restraint prohibited by the act must be an unreasonable one.

"The statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint. * * * Thus not specifying but indubitably contemplating and requiring a standard, it follows that it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute was intended to be the

measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided." White, C. J., Standard Oil Case, 221 U. S. at page 60, 31 Sup. Ct. at page 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. See, also, Harlan, J., dissenting, at page 102 et seq. of 221 U. S., page 532 of 31 Sup. Ct., 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.

In passing upon the question of unreasonable restraint, all the circumstances surrounding the alleged agreement or combination are to be taken into account, and, while the standard of conduct "in its nature and theory is a question of law" (Holmes, J., Le Roy Fibre Co. v. Chicago, Milwaukee & St. Paul Railway Co., 232 U. S. 340, 34 Sup. Ct. 415, 58 L. Ed. —— [February 24, 1914]), where the facts are in dispute the question will ordinarily be one for the jury to decide under suitable instructions.

The case therefore comes down to this: Whether upon the facts alleged in the indictment, which upon this demurrer must be taken to be true, a jury would be warranted in finding that there was an unreasonable restraint of trade by the defendants.

It is not possible to determine whether or not such a restraint of trade as is disclosed in this indictment is unreasonable, without having definitely in mind what constitutes a reasonable restraint of trade. See Stephen's Digest of Evidence (2d Am. Ed. by Chase) Introduction, pp. xvi and xvii. There is as yet no standard clearly established by statute or otherwise, applicable to a case of this character by which to determine the reasonableness or unreasonableness of the restraint in question. To say that an agreement is illegal if it is unreasonable does not, in the absence of a clearly understood standard, greatly advance the discussion. The presence or absence of competition and the manner in which it is or may be affected necessarily enter into the question.

At common law, the reasonableness of the restraint of competition in cases in which such restraint was permitted was measured by the character and extent of the business sold, and by what was fairly required for its protection. Oakdale Mfg. Co. v. Garst, 18 R. I. 484, 28 Atl. 973, 23 L. R. A. 639, 49 Am. St. Rep. 784. The facts were determined and compared, both as to the business sold and as to the extent of, and necessity for, the restraint.

"But the greater question is whether this is reasonable restraint of trade. And we do not see how a better test can be applied to the question whether reasonable or not, than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either; it can only be oppressive; and, if oppressive, it is, in the eye of the law, unreasonable." Tindal, C. J., Horner v. Graves, 7 Bingham Reports, 743; Joyce on Monopolies, § 109, collecting cases.

Like principles would seem to be applicable to the case before us. That prices were affected by the alleged agreement seems by itself not enough to render the agreement unreasonable. 23 Harv. Law Rev. 541, citing many cases. The very object of agreements as to price and of most business combinations is to affect prices; if that alone in-

validates them, all such agreements and most combinations are either nugatory or unlawful. The only combination permitted would be one which was of advantage to its members simply by reducing the cost of the goods sold; but this seems a shadowy and impractical distinction; it has never, so far as I am aware, been adopted by any court.

"If the object of the contract had been merely to provide in good faith a uniformity of prices among the parties thereto to avoid unhealthy fluctuations in the market, or if the contract had contemplated a joint and mutual association between the parties for the common benefit in the nature of a partnership, and had simply fixed the prices at what they considered the business would bear, instead of combination between independent manufacturers and dealers for the purpose of at least destroying all competition between themselves, then there might have been nothing in such an arrangement which the courts could denounce as pernicious and forbidden by law." Marr, J., Texas Standard Cotton Oil Co. v. Adoue, 83 Tex. 650, 657, 19 S. W. 274, 276 (15 L. R. A. 598, 29 Am. St. Rep. 690).

The public has no right to unrestricted competition among all the persons engaged in any given business, nor to the benefit of prices produced by such competition. Meredith v. Zinc & Iron Co., 55 N. J. Eq. 211, 221, 37 Atl. 539, per Pitney, V. C.; Joyce, Monopolies, § 101. The manner in which the restriction is effected—assuming no illegal intent to have existed—is not material, whether by a combination, by the appointment of a joint agent, or, as in this case, by mere agreement. Courts have not hesitated to disregard the form under which a restraint was effected if an illegal purpose or result was shown. By parity of reasoning, if the purpose or result are lawful, it is immaterial in what manner they are accomplished. Joyce on Monopolies, § 106. Each case is to be decided on its own facts. Joyce on Monopolies, § 102. What restriction of competition is permissible will differ widely according to the business situation in which the contracting parties find themselves. An agreement between persons engaged in quasi public employments, monopolistic in character, might be held unreasonable on much slighter grounds than an agreement between persons having no public franchises and no natural monopoly, and against whom ordinary competition might be expected to be effective.

In order to make a restraint unreasonable, it must, it seems to me, appear either (1) that the normal volume of interstate trade has been interfered with by artificial agencies affecting to a substantial degree, to the disadvantage of the public, the prices or supply of the product, commodity, or business which is the subject of the alleged restraint, and going beyond what is fairly required for the proper protection of the parties accused; or (2) that by means of a combination or agreement between the parties concerned, either by themselves alone or in connection with others, the price or supply of the product, commodity, or business, which is alleged to be the subject of undue restraint, is or may be affected to a substantial extent to the disadvantage of producers or purchasers, so as thereby to operate in a material degree to the injury of the public, and beyond what can fairly be said to constitute a proper protection for the parties to the alleged combination or agreement; or (3) that there has been direct and intentional interference with the transportation of commodities between the states.

Considering, on the one hand, the situation of the parties to the agreement, the possibilities of loss to them which unrestricted competition involved, and their right to protect themselves fairly against it, and, on the other hand, the public needs and the advantages to the public from unrestricted competition, it must appear that the defendants have done more than was fairly justified by reasonable self-protection, and have thereby obtained an unfair advantage in the trade in question. In the absence of unlawful intent and actual oppression a restraint of competition would hardly be deemed unreasonable, unless so wide and far-reaching as substantially to alter the general conditions under which persons engaged in that trade in that district did business. A limited market and one nicely balanced as between buyers and sellers might be greatly disturbed by an agreement between only a few buyers or sellers, while a broader market might not be unfairly affected by a combination involving many persons and large amounts of goods.

"The application of the rule does not depend upon the number of those who may be implicated, or the extent of space included, in the combination, but upon the existence of injury to the public. One combination, consisting" in a number "of those engaged in a given branch of trade, may amount to a practical monopoly, while another, less extensive in scope, may, as well, bring disaster in its train." Starrett, C. J., Nester v. Continental Brewing Co., 161 Pa. 473, 29 Atl. 102, 24 L. R. A. 247, 41 Am. St. Rep. 894.

What has been said so far applies to cases in which there was no unlawful intent, i. e., no intent to do more than protect the business of the contracting parties.

"Of course, if the necessary result is materially to restrain trade between the states, the intent with which the thing was done is of no consequence. But when there is only a probability, the intent to produce the consequences may become important." Lurton, J., U. S. v. Reading Co. et al., supra.

The intent charged in the indictment is:

"To wrong the public and to oppress and limit the rights of milk producers in the states aforesaid by depriving said producers of the higher price for milk which would have resulted from free and open competition among said defendants, all as aforesaid."

While I do not think it necessary to decide whether this allegation of intent adds anything to the indictment, it seems to me at least doubtful whether it does so. If the defendants had a right to agree to refrain from competition in price, their intent to deprive the public of the advantages of competition inter se would not be an unlawful one. It is perhaps true that an agreement which might be valid if made by the defendants for their own advantage would be illegal if made for the purpose of oppressing the public; in other words, if it was a purely malicious, and not a selfish, affair—but the combination alleged is plainly not of that character. The great doubt about the case is whether any combination can be found to be an unreasonable restraint of trade in the absence of coercive methods, of monopolistic control over some commodity or service, and of intent to exclude others from the industry in question—matters which have been to some extent relied on by the Supreme Court in decisions under this statute. Standard Oil Case, 221 U. S. 1, 75, 76, 77, 31 Sup. Ct. 502, 55 L. Ed.

619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; U. S. v. St. Louis Terminal Co., 224 U. S. 383, 395, 32 Sup. Ct. 507, 56 L. Ed. 810; U. S. v. Winslow, 227 U. S. 202, 217, 33 Sup. Ct. 253, 57 L. Ed. 481. It seems to me, however, that the elements referred to, while usually present in such cases, are not essential.

Applying these views of the law to the case at bar: Here is a well-defined and extensive industry consisting on the one side of producing milk and selling it, and on the other side of buying it and shipping it to Boston and vicinity and Worcester. Eighty-six per cent. of the buying side of this industry was in the hands of these defendants. For them to agree upon prices which they would pay, and thereby to eliminate practically all competition as to price among buyers, may be found to have so seriously affected the conditions under which all persons engaged in that industry did business as to be an unreasonable restraint of trade. It is true that the milk produced might have been sold through other channels; but it is also true, as a matter of common knowledge, that it takes time to divert business from one channel into another. The sellers ought not to be compelled either to find other outlets for their product, or to await the re-establishment of competition among buyers, being obliged meanwhile to sell their output at prices affected, if not established, by the combination of buyers, and in the making of which competition had been practically eliminated.

On the day after this agreement went into effect, what was the producer of milk to do with his product? His choice was either to take the uncompetitive price obtainable, or, with a perishable product, to start in to hunt up other markets for it. He ought not to be put into that position. He was not entitled to a continuance of all the competition that had existed the day before, in the channel through which he was accustomed to dispose of his goods; but, as one of the public, he was entitled not to have all effective competition as to prices in that channel suddenly suppressed by agreement between 86 per cent. of the buyers therein. The fact that the alleged agreement does not appear to have been used oppressively is not sufficient to save it. In cases of restraint of trade or monopoly not arising under the Sherman Act, the prevailing view (although there has been some difference of opinion on this point) is that the potential evils of a monopoly or dominating control in any trade are sufficient to invalidate agreements having that purpose or result without proof of actual injury or evil result. People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690. The reasoning of these cases seems applicable to present conditions; and where the purpose or result of an agreement is to give the parties thereto a monopoly of any commodity, or a dominating control in any trade, the agreement would seem, prima facie at least, to be unreasonably extensive and therefore illegal.

It may be that the trade in milk for the Boston and Worcester markets was so closely interwoven with the general business of producing and selling milk that the agreement alleged may, upon a trial of this indictment, be found not to have substantially and unfairly limited the rights of the producers, because they still had other sufficient markets for their product which were not affected by the combination between

these defendants, nor to have conferred upon the parties to it any real domination or control of prices, and to have been only a fair limitation as between themselves of what would otherwise have been destructive competition. But there are limits to the right of collective bargaining, and, upon the facts stated in the indictment, it seems to me that the alleged combination might be found to have been unreasonably extensive and an unreasonable restraint of trade.

[6, 7] As to the second count of this indictment:

This count charges, as has been said, an attempt to monopolize trade. In all such cases which have heretofore come before the courts under the Sherman Act, there was on the part of the defendants ownership or control of the commodity. Upon such facts, there was no necessity for a sharp distinction between a combination in restraint of trade and a monopoly. No case has been found under that act in which a charge of attempted monopoly was based on an agreement among buyers only, without regard to the market in which they resold. As has been pointed out, there is no allegation, express or implied, in this indictment that these defendants dominated or controlled the markets in which they sold their milk. A "monopoly," both at common law and under this statute, implies, I think, the control of goods or service which the public desires to obtain. An attempt to monopolize means an attempt to get control of the industry in which the defendant is engaged "by means which prevent other men from engaging in fair competition with him." Re Greene (C C.) 52 Fed. 116; Joyce on Monopolies, §§ 65–69. There may be, I think, an unreasonable restraint of trade which does not constitute a monopoly; though there can be no monopoly which does not constitute an unreasonable restraint of trade.

The business of these defendants was buying milk from the producers and selling it again to the public. The only way in which the combination alleged could in any way tend to enlarge their control of that business was by forcing down the price at which they bought, so that they would be able to undersell their competitors in the selling market. No facts are alleged from which any such purpose or intent can be inferred. It is not apparent how the alleged agreement as to buying prices would tend in any way to enlarge the defendants' control of their buying market, or to exclude competitors therefrom. Its natural effect would seem to be just the reverse. The indictment alleges that the agreement was made "with the intent to wrong the public and to oppress and limit the rights of milk producers *、* * by depriving said producers of the higher prices for milk which would have resulted from free and open competition among said defendants." There can be no monopoly unless there is something which is monopolized. These defendants combined no tangible property, nor any control of tangible property. What they had was the ability and willingness to buy milk. It is not unlike a combination not to bid, or to bid only an excessive price, for public work, which has been held illegal, but which is certainly not a monopoly. Gibbs v. Smith, 115 Mass. 592 (but compare Marshalltown Stone Co. v. Des Moines Brick Mfg. Co., 114 Iowa, 574, 87 N. W. 496). The manifest purpose of the agreement set out was to eliminate competition as to price in buying be-

tween the defendants; and, upon the facts alleged, no other intent or purpose can be discovered.

This count therefore seems to me not to charge a crime.

[8] As to indictment No. 453:

This indictment charges a conspiracy in restraint of trade. It does not contain the allegations of indictment No. 454 as to the percentage of milk sold in the country districts for shipment to the Boston and Worcester markets, which was bought by the defendants, nor any allegations from which it can be inferred that the defendants either controlled or were dominating factors in the buying market in the country or selling markets in those cities. For aught that appears, they may have been unimportant factors in each one. This indictment would have been good if no question of reasonableness were open. U. S. v. Addyston Pipe Co., supra. But under the Sherman Act that question is open, and the indictment must, as above explained, allege facts warranting a finding by the jury that the restraint was unreasonable. The facts alleged do not justify such a conclusion, and no crime is therefore charged. Everything which this indictment sets out may be true, and still the combination or conspiracy may not have extended beyond what was reasonable, nor have unduly affected the conditions under which other persons engaged in that industry, either buying or selling, did business.

In State v. Eastern Coal Co., 29 R. I. 254, 70 Atl. 1, 132 Am. St. Rep. 817, 17 Ann. Cas. 96, the indictment charged, in substance, that the five defendants did—

"combine, confederate and conspire together by divers unlawful and fraudulent devices, contrivances, and acts, unlawfully to regulate the price at which coal should be sold in the said city of Providence, * * * which said coal was then and there an article of prime necessity to the public and the consumers thereof."

The defendants demurred, and the court sustained the demurrer, holding that monopoly was the gist of the common-law offense, and that, as it did not appear from the indictment that the defendants had any power of control over the coal trade, they could not create a monopoly. The case raised the question whether every agreement to regulate the price of a prime necessary of life was criminal at common law; and the court, in sustaining the demurrer, decided that this was not so. The decision implies that under some circumstances such agreements may lawfully be made.

At the arguments on these demurrers it was said that the trial of the cases before a jury would take not less than six weeks and might take double that time. It is deplorable that the government and the defendants should be compelled to go to the trouble and expense which such a trial involves upon the opinion of a single judge on a doubtful question of law. But there is no way under the federal practice by which the lower court can present such questions as are raised by these demurrers to the first count of indictment No. 454 to an appellate court until after verdict and judgment. The case shows the need of legislation giving the District Courts of the United States the right, now possessed by trial courts in many of the states, to report important and

doubtful questions of law to the appellate court for determination before trial upon the facts.

The result is:

That indictment No. 453 is adjudged insufficient in law, the demurrers thereto are severally sustained, and the defendants go therefrom without day.

That indictment No. 454 is adjudged sufficient in law as to the first count thereof, that the demurrers to said count are severally overruled, and that the defendants are given leave to plead to said count on or before April 1, 1914.

That indictment No. 454 is adjudged insufficient in law as to the second count thereof, that the demurrers to this count are severally sustained, and that the defendants go therefrom without day.