# UNITED STATES v. COLUMBIA STEEL CO. et al.

## Civ. No. 1010.

District Court, D. Delaware.

Nov. 7, 1947.

672

See also 71 F.Supp. 734, 7 F.R.D. 183.

Robert L. Wright and W. Wallace Kirkpatrick, Sp. Assts. to the Atty. Gen., and John F. Sonnett, Asst. Atty. Gen., and John J. Morris, Jr., U. S. Atty., of Wilmington, Del., for plaintiff.

Alfred Wright, of Los Angeles, Cal., and Aaron Finger (of Richards, Layton & Finger), of Wilmington, Del., for defendant Consolidated Steel Corporation.

Nathan L. Miller, of New York City, Roger M. Blough and Merrill Russell, both of Pittsburgh, Pa., and Edwin D. Steel, Jr., (of Morris, Steel, Nichols & Arsht), of Wilmington, Del., for defendants Columbia Steel Co., United States Steel Corporation and United States Steel Corporation of Delaware.

RODNEY, District Judge.

Comprehensive findings of fact and consequent conclusions of law have been separately filed. This opinion merely epitomizes such findings and conclusions with such comment as may seem material.

This is an action brought by the government against the named defendants for alleged violations of the Sherman Act, 15 U.S.C.A. § 1 et seq. The controversy grows out of a contract dated December 14, 1946 looking toward the acquisition by Columbia Steel Company for a consideration of some $8,000,000 of all the assets and good will of Consolidated Steel Corporation and of four of its wholly owned subsidiaries, viz., Western Pipe and Steel Company of California, The Steel Tank and Pipe Company of California, Consolidated Shipyards, Inc. and Consolidated Steel Corporation of Texas, collectively referred to as Consolidated. Abbreviations of corporate names will be freely indulged. Columbia is a wholly owned subsidiary of United States Steel Corporation, one of the defendants, as is also United States Steel Corporation of Delaware, also a defendant, which latter company allegedly renders technical assistance to all of the U. S. Steel subsidiaries engaged in rolling and fabricating steel products and controls their business policies.

The geographical territory denominated as the "Consolidated Market" includes 11 states, Arizona, California, Idaho, Louisiana, Montana, Nebraska, New Mexico, Oregon, Texas, Utah and Washington. Within this territory it is claimed that Consolidated is the largest fabricator of steel products other than fabricators which are owned or controlled by producers of rolled steel

products. It is also claimed that, within the designated area, U. S. Steel, through its subsidiaries, and especially through Columbia, sells a substantial part of the rolled and fabricated steel products there sold.

The government therefore contends that the effect of the agreement of sale, as above mentioned, is to eliminate substantial competition in the sale of rolled steel products and the manufacture and sale of fabricated steel products, and therefore is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. The government also contends that the agreement is an attempt by U. S. Steel to monopolize the production and sale of fabricated steel products in the area described in violation of Sections 1 and 2 of the Sherman Act.

The several defendants deny that the agreement or its consummation will be in restraint of trade or injurious to the public interest. They insist that both the purchase and sale are dictated solely by the consideration of sound business reasons and will have no tendency to prejudice the public interest.

It is agreed that the facts in this case are not in sharp dispute. It is the conclusion to be drawn from the facts that constitutes our difficulty. The government contends that while the consummation of the agreement of sale would not constitute a complete monopolization of the territory in violation of Section 2 of the Sherman Act, yet such action would result in the elimination of substantial competition and be in restraint of trade. The defendants on the other hand contend that as competition in the past has been unsubstantial and meagre, so the consummation of the agreement will leave that competition still negligible in character. They contend that the contract in question was solely dictated by sound business policies and integration, the effect of which will result in the promotion of the public interest.

It is, since Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734, the well-settled rule that it is not every restraint of trade that comes within the prohibition of the Sherman Act, but only such a restraint as is an unreasonable one under the facts of the particular case. It is also true that we are not left without some criteria to determine the reasonableness or unreasonableness of the restraint involved, for it has been held that "the standard of legality was the absence or presence of prejudice to the public interest by unduly restricting competition or unduly obstructing the due course of trade."[1] It is also clear that an unreasonable restraint may be considered in connection with a limited geographical area. The government contends that the proposed agreement would unreasonably restrain trade within the states heretofore named, which are here spoken of as the "Consolidated Market." The defendants deny such effect or that any purpose of the agreement has such object in view.

Before detailed consideration of the activities of the respective parties it may be well to state our general conception of the terms herein used. The complaint alleges the agreement will eliminate substantial competition in the "sale of rolled steel products and in the manufacture and sale of fabricated steel products." The complaint defines "rolled steel products" as the raw materials from which the fabricated steel products are made and consists of "steel plates, sheets, shapes and bars."

We must now consider the designated companies and their subsidiaries and determine how far the activities of one may impinge upon or compete with the other. Because the consummation of the agreement would remove Consolidated as an independent entity, we may first consider the nature of its activities: first, as competitive with some subsidiary of the United States Steel Corp. and, secondly, insofar as its activities concern the industry as a whole in the Consolidated Market.

Consolidated is a company of considerable size and value, the agreement of acquisition here considered being for a consideration upwards of $8,000,000. Consolidated does not manufacture or produce any rolled steel products and is not affiliated with any steel producing company. Its ac-

---

[1] International Shoe Company v. Federal Trade Commission, 280 U.S. 291, 298, 50 S. Ct. 89, 91, 74 L.Ed. 431.

tivities are confined to fabricating steel and for this purpose it owns and operates eight plants, six in California, one in Arizona and one in Texas. For the purposes of this case a distinction may be drawn between two classes in the development of steel products, viz., a fabricator of such products and a manufacturer. A fabricator is one who contracts to construct a specific product such as a building, bridge, or other structure according to special design and specification. A manufacturer, on the other hand, is a producer of finished steel products by means of repetitive processes resulting in various standard types of merchandise. Consolidated is purely a fabricator in accordance with this distinction and not a manufacturer.

In the fabrication of steel, insofar as this case is concerned, there are two general classes of fabrication, viz., structural fabrication and plate fabrication. Structural fabrication includes bridges, steel buildings and structural frames. Plate fabrication is somewhat more diversified and consists of pressure vessels such as cylindrical containers, bubble and cracking towers used in the oil industry, penstock or piping, well casing, corrugated culverts and other somewhat similar articles.

Consolidated is a fabricator of both structural and plate products although only two of its eight plants are equipped to fabricate structural products and the fabrication of plate products represents some 70% of its activities.

In order to determine the extent of existing competition between Consolidated and any or all of the subsidiaries of the United States Steel Corp. within the geographical area here considered, it will be necessary to contrast the activities of Consolidated and the activities of some subsidiary of U. S. Steel within the specified line of activities. This will involve:

(1) A comparison between activities of Consolidated as to structural fabrication within the territory and the activities of the only two subsidiaries of U. S. Steel proven to be involved in that line of endeavor, viz., American Bridge Co. and Virginia Bridge Co.;

(2) A comparison between the activities of Consolidated as to plate fabrication from rolled steel plates and the activities of some one or more of the subsidiaries of U. S. Steel. There is no evidence of the activity of any subsidiary of U. S. Steel as to plate fabrication other than that of penstock or piping and therefore consideration of this branch of the matter will be confined to that subject.

In order to ascertain the degree of competition between Consolidated and U. S. Steel as to structural fabrication in any one year, some care must be exercised. Figures are illusive and consolidation of statistics depends upon many factors. Bookings are not entirely reliable because they are apt to spread over a considerable period of time and do not accurately represent annual operations. Bookings, sales and extent of business are of value only when the line of activity of the two companies is the same and two companies are, in fact, competitive. This competitive relationship can best be shown by a comparison for the last 10 years of that work which was sought, at least in part, by both Consolidated and U. S. Steel and other competing companies.

### Data for the Ten-Year Period 1937–1946

|  | No. of Jobs | Tons |
|---|---|---|
| Bid by U. S. Steel | 2,409 | 1,273,152 |
| Awarded to U. S. Steel | 839 | 499,605 |
| Lost to Competition | 1,570 | 773,547 |
| Lost to Consolidated | 35 | 24,162 |
| Lost to others than Consolidated | 1,535 | 748,385 |
| Per cent of total lost to Consolidated | 1.5% | 1.9% |
| Per cent of total lost to others than Consolidated | 63.6% | 58.6% |
| Per cent of jobs lost that were taken by Competitors other than Consolidated | 97.8% | 96.9% |

The exhibit from which these figures are taken shows the detailed diversification of all structural fabrication included in the jobs sought by U. S. Steel and shows that U. S. Steel lost to Consolidated only 1½% of these jobs and less than 2% of the tonnage, while parties other than either U. S. Steel or Consolidated were successful in over 97% of the jobs and 96% of the tonnage. Indeed, the number of jobs as to which Consolidated and U. S. Steel were actually competitive in the sense that both bid was quite small as compared to the total number of bids made by both companies. Of 8,620 bids made by one or both of the companies, there were only 166, or less than 2%, bid on by both.

Substantially the same result is obtained from a study of an exhibit showing the details of bidding by Consolidated for various types of structural fabrication as to some of which U. S. Steel, as well as other competitors, also bid.

We must now consider such competition as exists in plate fabrication in relation to the manufacture and sale of penstock or piping. Both Consolidated and subsidiaries of U. S. Steel, especially the National Tube Company, make and sell steel pipe and tubing. True competition can only be determined by an examination as to whether their products do fairly cover the same field and uses and whether one is reasonably competitive of the other.

At several of its plants Consolidated fabricates and sells piping of various sizes. The U. S. Steel Corp. through the National Tube Co., fabricates and, through the Oil Well Supply Co., sells, certain classes of piping. Much testimony was devoted to the explanation of the differences between the types of piping, both as to their uses and general character of fabrication. This testimony, uncontradicted as it is, clearly establishes that while there is some overlapping or duplication in the sizes of the piping,

### Data for the Ten-Year Period 1937–1946

|  | No. of Jobs | Tons |
|---|---|---|
| Bid by Consolidated | 6,377 | 578,847 |
| Awarded to Consolidated | 2,390 | 159,997 |
| Lost to Competition | 3,987 | 418,850 |
| Lost to U. S. Steel | 40 | 38,920 |
| Lost to Others than U. S. Steel | 3,947 | 379,930 |
| Per cent of Total Lost to U. S. Steel | .6% | 6.7% |
| Per cent of Total Lost to Others than U. S. Steel | 61.9% | 65.6% |
| Per cent of Jobs Lost that were taken by Competitors other than U. S. Steel | 99.0% | 90.7% |

It is apparent from this exhibit that U. S. Steel only successfully competed in six-tenths of one per cent of the jobs and six per cent of the tonnage involved, while other competitors succeeded in obtaining 99 per cent of the jobs and over 90% of the tonnage.

From the foregoing it is not apparent to me that the competition between U. S. Steel and its subsidiaries on the one hand, and Consolidated on the other, as to structural fabrications is so substantial as to constitute by its removal a prejudice to the public interest.

yet between the two kinds there is no substantial competition. Consolidated makes only an electric welded pipe by one of two processes. This piping is made from a flat rolled plate or strip, rolled into a cylindrical form and welded. It is a comparatively light walled pipe for low pressure purposes solely, such as irrigation, water transmission and water well casings. U. S. Steel makes no pipe from a flat rolled plate with the consequent seam. It makes only forged steel pipe from a solid round, forged and rolled and without seam. It is essentially a heavy walled pipe for high pressure pur-

poses only and is chiefly used in the oil and gas industry. The testimony shows a substantial price range in favor of the U. S. Steel process and that no substantial competition exists. It is in evidence that the only recent instance of the alternative use of one pipe for the other grew solely out of the impossibility of obtaining the kind desired.

This then brings me to a consideration of the suggestion that the purchase of Consolidated by U. S. Steel and the possible removal of Consolidated as a potential purchaser of steel products from competitors other than U. S. Steel constitutes a substantial restraint of trade, detrimental to the public interest and an attempt to obtain a monopoly. This matter differs from the question of competition heretofore considered because here the question of detriment to the public interest is more diluted and concerns primarily the possible loss to a competing producer of steel by the removal of a potential customer, viz., Consolidated. This loss to competitors of a potential customer might be brought about by various causes which need not be herein discussed. It is unnecessary to consider the question as to how far the Sherman Act deals with this feature of restraint as affecting the public interest, because an examination of the figures involved compels the conclusion that the subject matter of the suggestion lacks substantiality. A consolidation of certain exhibits makes clear certain figures. It shows the total sale of rolled steel products in the 11 states constituting the Consolidated Market for the decade last past, including the abnormal post-war years when demand has exceeded the supply; it shows that while at times purchases by Consolidated from subsidiaries of U. S. Steel exceeded purchases from other competitors, yet in other years this proportion was reversed, each party exceeding in five years of the decade. This combined table shows that the average annual purchases by Consolidated from subsidiaries of U. S. Steel bore to the total sales of rolled steel products in the Consolidated Market but the figure of 1.39 per cent, and that the average annual purchases by Consolidated in the same period and from parties other than U. S. Steel subsidiaries and disconnected therewith was the figure of 1.58 per cent of the total sales of rolled steel products in the Consolidated Market. Such consolidated table is as follows, there being minor discrepancies between the tables submitted by the various parties:

| | Total Distribution of Rolled Steel Products in U. S. | Total Sales of Rolled Steel Products in the Consolidated Market | Total Purchases by Consolidated from Subsidiaries of U. S. Steel Corp. | % of Col. 3 to Col. 2 | Total purchases by Consolidated from others than U. S. Steel Corp.'s Subsidiaries. | % of Col. 5 to Col. 2 |
|---|---|---|---|---|---|---|
| 1937 | 38,345,158 | 4,362,900 | 59,677 | 1.4 | 43,609 | 1 |
| 1938 | 21,356,398 | 2,670,000 | 23,240 | .9 | 20,810 | .8 |
| 1939 | 34,955,175 | 3,630,000 | 43,179 | 1.2 | 26,685 | .75 |
| 1940 | 45,965,971 | 4,337,990 | 51,982 | 1.2 | 65,662 | 1.5 |
| 1941 | 60,942,979 | 6,008,757 | 88,316 | 1.5 | 75,112 | 1.3 |
| 1942 | 60,591,052 | 8,489,204 | 181,492 | 2 | 158,219 | 1.8 |
| 1943 | 62,210,261 | 10,124,831 | 170,684 | 1.7 | 233,496 | 2 |
| 1944 | 63,250,519 | 9,587,503 | 120,417 | 1.3 | 270,115 | 2.9 |
| 1945 | 56,602,322 | 7,232,590 | 67,371 | 1 | 157,902 | 2.2 |
| 1946 | 48,993,777 | 6,000,000 | 83,846 | 1.7 | 94,823 | 1.6 |
| | 493,213,612 | 62,443,775 | 890,204 | 13.9 | 1,146,431 | 15.8 |
| | | | | Av. 1.39 | | Av. 1.58 |

It is, of course, true that upon the consummation of the agreement certain companies heretofore furnishing steel to Consolidated may find that outlet difficult to continue; it is true that subsidiaries of U. S. Steel will presumably furnish to and for the business requirements heretofore enjoyed by Consolidated such portions of rolled steel products as may be available for such demand, but such result of and by itself does not seem contrary to either the language or spirit of the Sherman Act.

■ Both parties have discussed the reasons prompting the proposed purchase and sale herein discussed and, what is not unusual, have reached diametrically opposite conclusions. It would seem that in determining the legality of transactions challenged under the Sherman Act the underlying reasons for the proposed transaction should be proper subjects of inquiry. This is not to say that a transaction having its inception upon the soundest possible business reasons could be approved if its consummation be detrimental to the public interest and in restraint of trade, but in determining the extent of public interest the reasons prompting the transaction may be inquired into. In considering the reasons prompting the transaction the discussion will be limited to those reasons affecting U. S. Steel. The reason prompting the directorate of Consolidated to enter into the agreement of sale seems clear and undisputed. It was that during the war years the company had accumulated a substantial equity in the form of surplus and that the directorate thought it for the best interests of the stockholders that this surplus be distributed to the stockholders rather than be utilized and exposed to risk in the further prosecution of business in the then uncertain post-war period. The soundness of this reason and the accuracy of this forecast is not for this court to determine, but it is in evidence that Consolidated before entering into the contract in question had made preliminary advances of a similar nature to other parties including a chief competitor of U. S. Steel in the country-wide field as well as in the Consolidated Market. The agreement here involved is, too, subject to approval by stockholders of Consolidated.

The U. S. Steel Corp. and its subsidiary, the Columbia Steel Company, insist that not only is the contract of proposed sale not violative of any provision of law but was actuated solely by the soundest business reasons affecting not only the defendants themselves but as enhancing the public interest. Even a condensed statement of these reasons involves some undesirable prolixity.

In May, 1941, and during the war period, the government asked the U. S. Steel Corporation to erect a very large steel plant at Geneva, Utah, having a listed capacity of producing 1,000,000 tons of steel annually. The plant was erected and operated by U. S. Steel without charge or fee and the cost of the plant was in excess of $190,000,000. In January, 1945, the U. S. Steel Corporation notified the government that when the time came to consider a sale or lease of the plant it would be interested in discussing the possibilities of such action. Opposition to the acquisition of the Geneva plant by U. S. Steel developed both within that corporation and among the interested public and, while war still continued, the U. S. Steel Corporation notified the government that it was no longer interested in the acquisition of the plant. Subsequently the Surplus Property Administrator for the government took active steps relative to the Geneva plant. All 30 of the integrated companies of the country having a capacity of 300,000 ingot tons were circularized and answers were received from 28. The sale of the plant was advertised and U. S. Steel was expressly requested by the government to submit a bid. Some seven bids were received. The bid of U. S. Steel, including purchase price of plant and inventories and obligation to install necessary facilities for conversion to peace-time activities, amounted to approximately $66,000,000, together with a proposal to expend an additional $25,000,000. The bid of U. S. Steel, after a very full evaluation, was accepted and, in such acceptance, certain reasons were assigned which, in view of the contentions of the defendant, may have materiality. The government found the acquisition by U. S. Steel would:

"Assure the most effective use of the Geneva Steel plant for war purposes and common defense.

"Stimulate full employment including employment of war veterans.

"Foster post-war employment opportunities not only in the Geneva plant but also in the steel-consuming industries in the West.

"It will promote production, employment of labor and utilization of the productive capacity and natural resources * * * of the country."

The sale of Geneva to the U. S. Steel Corporation was passed upon and approved by the Attorney General of the United States.

Immediately upon the acquisition of Geneva steps were taken looking to the outlet of its product. It was obvious that to maintain employment in a plant with a listed capacity of 1,000,000 tons and an estimated average 5-year production of from 456,000 to 600,000 tons, the product must be provided for. With some disregard of economy some 386,000 tons of hot-rolled coils contemplated for production at an Alabama plant were diverted to Geneva. In order to supplement this, so-called, "back-log" of requirement it was deemed essential either that U. S. Steel within the Consolidated Market erect new fabricating facilities with the development of consequent sales forces or otherwise obtain such facilities. Plans had been considered some time previously for the erection of fabricating plants but definite plans had not materialized.

In November, 1945, when U. S. Steel had no interest in the acquisition of the Geneva plant and had so notified the government, Mr. Roach, President of Consolidated, approached Mr. Fairless, President of U. S. Steel, with a view of the acquisition of Consolidated by U. S. Steel as hereinbefore recited. He received no encouragement in his effort. In the early Spring of 1946 after U. S. Steel had again become somewhat interested in Geneva, but before its bid therefor, Mr. Roach again approached Mr. Fairless as to the purchase. Mr. Roach was told that until the course of U. S. Steel with reference to the Geneva plant was settled the question of acquisition of Consolidated could not be discussed.

In April, 1946, U. S. Steel submitted its bid for the Geneva plant, which was subsequently accepted. Thereafter it became increasingly necessary to provide sufficient outlet for Geneva products and especially when the post-war abnormal demand for steel products should abate.

To the requirements of Geneva other economic considerations seemed to require the establishment by U. S. Steel of fabricating facilities in the Consolidated Market of Western states. Before and during the war a majority of its shipments into the Consolidated Market was sold to agencies of the federal government. These were made on Land Grant freight rates considerably lower than commercial rates and these Land Grant rates have all been abolished and commercial freight rates on fabricated structural steel shipped from the East have been increased. To maintain competition it was considered essential that fabricating facilities within the Consolidated Market be provided. It was ascertained that new construction of these fabricating facilities due to increased costs of building and scarcity of material would be difficult and, in any event, would involve several years' delay. Accordingly, negotiations were reopened with Consolidated which culminated in the agreement which is the subject matter of this litigation.

The government contends that the consummation of the proposed agreement would substantially eliminate competition in designated fields of effort and in violation of the Sherman Act. The government contends that since, in its judgment, an illegal restraint of trade was the effect of the proposed agreement and since the contracting parties must have intended the natural consequences of those acts, so U. S. Steel must have intended the illegal consequences which would flow from the agreement.

I find that the proposed agreement would not substantially remove competition, and it is, therefore, not inappropriate to state the reason of the purchase as sworn to by the President of the U. S. Steel Corporation.

In answer to a question as to what was the purpose and object in negotiating and consummating the agreement with Consolidated, the answer was: "The object was just one, one motive and only one motive, and that was to secure sufficient backlog

to operate the newly acquired Geneva Steel plant on a successful basis from the standpoint of furnishing satisfactory employment to almost 6000 employees and also fulfilling the obligation which we had made to the government and to the citizens of the West, that we would, to the best of our ability, operate that plant successfully and in the interests of building up the industrial west. That was the only objective that I had at that time, and the only one I still have."

A remaining inquiry must determine whether the foregoing application of facts is inconsistent with any established principle of law.

The government cites a number of authorities as sustaining the position taken by it. It relies quite strongly on United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 1564. That case, as I view it, did not change any pre-existing rule to the effect that the Sherman Act contemplated only such restraints of trade as were unreasonable in character and extent nor make the Act apply where merely some appreciable restraint was involved. The cited case arose from a motion to dismiss the complaint. It was held that the amount of interstate trade or commerce was immaterial in determining whether an unreasonable restraint had been charged in the complaint. The court says of the Sherman Act, "Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected." The court also says, "The test of illegality under the Act [Sherman] is the presence or absence of an unreasonable restraint on interstate commerce." Nothing in the Yellow Cab case seems inconsistent with the views herein reached.

The government also relies upon United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760, and United States v. Lehigh Valley R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253. The cited cases seem not determinative of any issue involved in this case. In both cases the objectionable restraint of trade was based upon a deliberate calculated purchase for control accompanied by no normal expansion to meet the demands of business growing as a result of superior or enterprising management. The bases upon which these cases were determined seem lacking in the present case.

The case of International Shoe Company v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 91, 74 L.Ed. 431, has much of interest. While it involved proceedings under the Clayton Act, 15 U.S.C.A. § 18, yet those same principles are applicable to alleged violations of the Sherman Act. The cited case held that "mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree * * *; that is to say, to such a degree as will injuriously affect the public. Obviously such acquisition will not produce the forbidden result if there be no pre-existing substantial competition to be affected; for the public interest is not concerned in the lessening of competition, which, to begin with, is itself without real substance." In determining the extent of competition the court considered, with other matters of fact, the testimony of officers of the accused company as to the meagreness of such competition.

From a consideration of all the matters submitted to me, including an examination of the documentary evidence, I am of the opinion that the consummation of the proposed agreement is not in violation of Section 1 of the Sherman Act.

The alleged violation by U. S. Steel of Section 2 of the Sherman Act as an attempt to monopolize the steel fabricating business of the Consolidated Market will not be considered at great length. The plaintiff concedes that proof of a violation of Section 2 requires something more specific than even an unreasonable restraint of trade. The plaintiff concedes that even after the consummation of the proposed agreement the monopolization would not be complete. Having found that the acquisition of Consolidated Steel Corporation would not materially affect competition within the Consolidated Market and so not unreasonably restrain trade and commerce in rolled and fabricated steel products, in violation of Section 1 of the Sherman Act, then it will require considerable additional

circumstances to find from this same acquisition alone an intent to monopolize the production and sale of fabricated steel within the same market.

In other words, if the acquisition of the assets of Consolidated by U. S. Steel constitutes no offense under Section 1 of the Sherman Act as not having a tendency to illegally restrain trade or commerce, then that same acquisition, legal in itself, must be greatly augmented to constitute an attempt to create a monopoly in violation of Section 2.

■ The two sections of the Act, while contemplating separate offenses, do overlap in the sense that a monopoly under the second section is a species of restraint of trade under Section 1. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 84 L.Ed. 1129.

In the present case the government concedes "The two sections are, of course, directed to the same end and the second section simply prohibits a more specific form of trade-restraining conduct than the first."

In Standard Oil Co. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, the court said, "* * * The second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the first section."

It is unnecessary in this case to determine that there may be an unreasonable restraint of trade which does not constitute a monopoly, though there can be no monopoly which does not constitute an unreasonable restraint of trade, as held in United States v. Whiting, D.C., 212 F. 466, 478.

■ In this case the only matter suggested as violative of section 2 is the agreement hereinbefore mentioned and the effects of its consummation. To me it would seem that for an act to be violative of Section 2 as creating a monopoly or intending to create such monopoly, such act, if accomplished, would have a direct tendency to unduly restrain trade and commerce. Since I have reached the conclusion that this effect would not be present under Section 1 of the Act, so I think there is no violation of Section 2.

In the consideration of alleged violations of Section 2 of the Act the reasons prompting the parties to take the proposed action acquire greater force and relevancy than in violations of Section 1. Section 2 covers not only a completed monopolization but also an attempt to monopolize. The ascertainment of the bases upon which an attempt to monopolize is founded can only be had after a full consideration of the reasons prompting the proposed action. Some intent beyond the mere intent to do the act is basically present in an attempt to monopolize[2] and the reasons for action take on additional relevancy in determining this question of attempt. Those reasons for action have been heretofore stated and are particularly applicable in the consideration of Section 2, but will not be here restated.

■ It may be that in determining questions under Section 2 of the Sherman Act the exact percentage of interference with interstate trade or commerce may be immaterial in view of United States v. Yellow Cab Co., supra.[3] It must be true, however, that the proportional effect of a given action must have a bearing as to whether a monopoly has either been accomplished or intended. If this be not true, then no company having a very small but appreciable share of control of a given market or subject matter can ever acquire any additional share no matter how small it be, provided it be appreciable.

■ The action made unlawful by Section 2 of the Statute is the monopolization of or attempt to monopolize an appreciable part of commerce or trade. No attempt to control an appreciable part of commerce or trade could be a monopolization or attempt

2 United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 431, 432.

3 See "The Supreme Court and a Competitive Economy" by Zlinkoff & Barnard, 47 Col.Law Rev. 914, 930.

to monopolize unless the proportion of control by the party so attempting had some measurable relation to the subject matter within the given area. This area may be of restricted extent, but there must be some yardstick or measure of computation by which the interference with trade or commerce may be designated either, on the one hand, as an attempt to monopolize or, on the other, as a lawful business effort.

In United States v. Aluminum Co., 2 Cir., 148 F.2d 416, 424, the court considered the extent of control as constituting a monopoly in a given market. By using differing methods of computation the resultant control was found to be 33% or 64% or over 90%. In holding that over 90% would constitute a monopoly the court said, "It is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not."

In the present case there is no evidence showing that even after the consummation of the proposed agreement the percentage of control by U. S. Steel would be in conflict with the formula adopted in the cited case.

I am of the opinion that the evidence in the case fails to establish any violation of the Sherman Act as alleged in the complaint.