# UNITED STATES *v.* LEHIGH VALLEY RAILROAD COMPANY ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 1.  Argued October 12, 13, 1916; restored to docket for reargument May 21, 1917; reargued November 7, 1917; restored to docket for reargument June 10, 1918; submitted October 7, 1919; restored to docket for oral argument May 17, 1920; reargued October 5, 1920. —Decided December 6, 1920.

Prior to the enactment of the Anti-Trust Law, the Lehigh Valley Railroad Company, in combination with the Lehigh Valley Coal Company, a subsidiary created and operated as a mere agency or instrumentality of the Railroad Company, deliberately entered upon the policy of purchasing and leasing the anthracite coal lands in Pennsylvania tributary to its extensive railroad system, and of buying up the stocks of corporations owning such lands, for the purpose of controlling the mining, transportation and sale of the coal to be obtained therefrom and of preventing and suppressing competition, especially in the transportation and sale of such coal in interstate commerce.  This policy was continued after the enactment of the Anti-Trust Act, with the result that a practical monopoly was attained of the transportation and sale of the anthracite derived from the lands tributary to the railroad, the amount so transported coming to exceed one-fifth of the entire annual anthracite production of the country.  Considering this result, the methods employed in

achieving it, and the great volume of production and trade involved, as compared with the restricted area of the whole anthracite territory, *held*, that the combination effected a restraint of trade or commerce among the States and constituted an attempt to monopolize and an actual monopolization of a part of such trade or commerce in anthracite coal; within the meaning of the first and second sections of the Anti-Trust Act. P. 269.

For the purpose of divesting itself in appearance of interest in the coal transported, the Railroad Company, with the Coal Company, brought about the creation and organization of a Sales Company, whose stock was subscribed for by stockholders of the Railroad Company only, with the aid of a dividend declared by that company for the purpose, and whose management was largely made up of former agents and officials of the Railroad and Coal Companies; the Sales Company, thereupon, in pursuance of the plan, made, in form, an agreement with the Coal Company, for a term of ten years but subject to termination by either party on six months' notice, by which the Coal Company agreed to sell and the Sales Company to buy all coal mined or produced by the Coal Company, at prices mostly fixed at a specified percentage of New York prices, and by which the Coal Company agreed to lease all of its facilities, structures and trestles to the Sales Company, and the Sales Company was inhibited from buying any coal except from the Coal Company and from selling any not so purchased. *Held*, that the Sales Company was neither an independent buyer nor a free agent; and that the contract being a mere device to evade the commodities clause of the Interstate Commerce Act; and obnoxious also to the Anti-Trust Act, was void. *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516. P. 264.

225 Fed. Rep. 399, reversed.

THE case is stated in the opinion. A motion to modify the decree was made and denied at this term. Post, 617.

*The Solicitor General* for the United States.[1]

[1] At the first and second hearings the case was argued by *Mr. Solicitor General Davis* and *Mr. Assistant to the Attorney General Todd*. *Mr. Attorney General Gregory* and *Mr. Arthur W. Machen, Jr.*, Special Assistant to the Attorney General, were also on the brief. At the third hearing the case was submitted by *Mr. Attorney General Palmer* and *Mr. Solicitor General King*, on an additional brief.

*Mr. Edgar H. Boles* for Lehigh Valley Railroad Company, Delaware, Susquehanna & Schuylkill Railroad Company, and the individual defendants.[1]

*Mr. F. W. Wheaton*, with whom *Mr. Allan McCulloh* was on the briefs, for Lehigh Valley Coal Company and Coxe Brothers & Company, Inc.

*Mr. Nicholas W. Hacker*, with whom *Mr. Everett Warren* was on the briefs, for Lehigh Valley Coal Sales Company.

*Mr. E. V. B. Getty* filed a brief on behalf of the G. B. Markle Company.

*Mr. John Hampton Barnes* and *Mr. Elihu Root, Jr.*, filed a brief on behalf of the Girard Trust Company.

MR. JUSTICE CLARKE delivered the opinion of the court.

This is an appeal from a decree entered in a suit to dissolve the intercorporate relations existing at the time it was commenced in March, 1914, between the defendant corporations, other than Girard Trust Company, for the reason, it is averred, that they were so united that they constituted a combination in restraint of interstate trade and commerce in anthracite coal and an attempt to monopolize and an actual monopolization of a part of such commerce, in violation of the Anti-Trust Act of Congress of July 2, 1890, c. 647, 26 Stat. 209; and also for the alleged reason that the Lehigh Valley Railroad Company was transporting over its lines of railway anthracite coal in which it had an interest, in violation of the Commodities Clause of the Act of June 29, 1906, c. 3591, 34 Stat. 585.

---

[1] At the first hearing the case was argued by *Mr. John G. Johnson* and *Mr. Edgar H. Boles*. At the second hearing it was argued by *Mr. Edgar H. Boles*, who also submitted at the third hearing.

It will be necessary to consider only the relations and activities of the Lehigh Valley Railroad Company, hereinafter designated the Railroad Company, the Lehigh Valley Coal Company, designated the Coal Company, and the Lehigh Valley Coal Sales Company, designated the Sales Company.

A condensed history, chiefly admitted, of the organization, stock ownership and conduct of these three companies, and the application to the facts thus developed of fully established principles of law, will be decisive of the case.

The limited area of anthracite-producing territory, its relation to the interstate transportation system and markets of our country and the various attempts to monopolize and control the great railway tonnage originating therein have all been so often described in reported cases, that they need not be repeated here in detail.[1]

It will suffice for our present purpose to say that the anthracite-producing territory is very restricted in area, it all being within seven counties of eastern Pennsylvania with the known deposits underlying only 309,760 acres of land. For trade purposes it is divided into three fields, the northerly is called the Wyoming field, the next southerly the Lehigh or Middle field and the southerly the Schuylkill field. The lines of the Railroad Company extend into the Wyoming and Lehigh fields but to only one colliery in the Schuylkill field. Much the greater part of its tonnage is derived from the Wyoming field, and four-fifths of it moves in interstate commerce.

The Railroad Company in 1913 owned 1438 miles of main line and a total trackage of 3354 miles, its capital

---

[1] *United States* v. *Reading Co.*, 183 Fed. Rep. 427; *United States* v. *Reading Co.*, 226 Fed. Rep. 229; *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366; *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257; *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516; *United States* v. *Reading Co.*, 226 U. S. 324; *United States* v. *Reading Co.*, 253 U. S. 26.

stock was $60,600,000, its funded debt was $85,800,000, its total assets had a book value of $182,700,000, but a much greater actual value, and it carried a larger tonnage of anthracite coal than any other railroad in the country—over 13,000,000 tons in 1913, this being 18.84% of the total 69,000,000 tons shipped over all railroads in that year.

In 1864 the Railroad Company by merger with a coal company acquired a small acreage of anthracite-containing land and thereupon added the mining, shipping and selling of coal to its duties as a carrier.

The annual reports of the Railroad Company show that, as early as 1868, it entered upon the policy of acquiring by purchase and lease the control of as much as possible of the anthracite coal-containing lands tributary to its lines of railroad for the purpose of preventing, or, when it had become established of suppressing, competition in the carrying of coal over its interstate lines to interstate markets.

Thus the annual report of the Company for 1868 shows that, it having been determined that it was of "the utmost importance" to the future welfare of the company to secure "control of tonnage for our roads from regions having other outlets to market," the Company, by merger of two coal companies, obtained coal lands which secured to it the whole trade of the Hazelton Coal field and "the withdrawal from competition" of a business so large as to greatly strengthen the "future prospects of our road."

In 1869 the policy of securing a proportion of the coal trade from each region by the purchase of interests in companies owning lands on or near the several branches of the company was approved and "continued."

In 1871 it is reported, "We have continued to acquire interests in coal lands situated in our various regions."

In 1872, after detailing the purchase for $2,000,000 of 5800 acres of land having upon it ten collieries, the report of the Company declares that, "Should there be a corre-

sponding increase for a year or two more the total consumption will so nearly equal the full capacity of the mines for production as to *render unnecessary all attempts to regulate or control the trade.*"

After reciting that a contract had been entered into granting to the Delaware, Susquehanna & Schuylkill Railroad Company trackage rights to tidewater, the report of the Railroad Company for 1894 continues, saying that there is thereby assured to the Company "an important traffic . . . for which several outlets existed and which had been in contention for some time previously. It also removed an incentive to the construction of further new lines into the territory tributary to the Lehigh Valley System."

Although in 1875 it caused the Coal Company (hereinafter discussed) to be organized for the purpose of taking title to coal lands then owned or which might thereafter be purchased, and although the Anti-Trust Law was enacted in 1890, nevertheless, the Railroad Company continued its policy of purchasing for control and from time to time it acquired and took in its own name the title to extensive tracts of coal lands and to stocks in coal companies. Thus in 1885 it acquired the entire capital stock of the Wyoming Valley Coal Company, the owner of 1657 acres of anthracite land, in 1900 it acquired the entire capital stock of the Westwood Coal Company, a considerable owner of anthracite land, in 1901 it acquired the entire capital stock of the Connell Coal Company, and in the same year the entire capital stock of the Seneca Coal Company, the owner of 1308 acres of anthracite land.

In the years prior to 1905 the Railroad Company made a number of other purchases of coal land, but in that year it made its largest single and most significant purchase, when it acquired, for the sum of $17,440,000, all of the capital stock of Coxe Brothers & Company, Inc. This company was the largest independent coal operator then

on the line of the Railroad Company, and its production for 1905 exceeded 1,100,000 tons.  It not only owned extensive areas of coal land, on which were located eight collieries, but it was also owner of all of the capital stock of the Delaware, Susquehanna & Schuylkill Railroad Company, which owned fifty miles of railway which served other large independent mines in addition to those of Coxe Brothers & Company, Inc.  This railroad had connections with the Reading, Pennsylvania and New Jersey Central lines, which were taken up or fell into disuse when the control of it passed to the defendant Lehigh Valley Railroad Company.  The Railroad Company continued to own all the capital stock of Coxe Brothers & Company, Inc., to the time the testimony was taken in this suit and it is admitted that that company then held in fee or under long lease 36,490 acres of land in the anthracite field, 7,169 acres of which were known to contain anthracite coal.  This purchase was confessedly made to prevent the diversion of traffic to other lines, and, while the company was continued in form as a separate corporation, the officers and directors of the Coal Company were made its officers and directors, and in June following the year of the purchase its directors by resolution provided that the net earnings of the company should be paid to the Railroad Company without the formality of declaring a dividend, and this practice continued until 1911.

Thus, this important Coal Company and its railroad became a mere coal-producing and transporting agency of the defendant Railroad Company.

In 1874 the State of Pennsylvania adopted a constitution containing the provision that:

"No incorporated company doing the business of a common carrier shall, directly or indirectly, prosecute or engage in mining or manufacturing articles for transportation over its works." (Constitution of Pennsylvania, 1874, Art. 17, § 5.)

Prior to this time the Railroad Company had been a large owner, miner, shipper and seller, as well as carrier, of anthracite coal and, as if for the purpose of complying with the new constitution of the State from which it derived its franchise, it caused the Lehigh Valley Coal Company to be created in 1875 by the consolidation of two smaller companies. This company, which was organized for the purpose of taking title to coal lands and stocks in coal companies, then owned or thereafter to be acquired by the Railroad Company, and to conduct the business of mining, shipping and selling coal, had an original capital of $650,000, which was afterwards increased to $1,965,000, all of which has been owned by the Railroad Company from the beginning. Coal-producing lands and stocks in various coal companies were purchased from time to time by the Railroad Company, directly or through advances of money to the new coal company for that purpose, title thereto being taken in the Coal Company, with the result: that when this suit was commenced that company admitted itself to be the owner of 54,229 acres of land in the anthracite-producing regions, of which 24,748 acres were located along the lines of the Railroad Company; that the funded debt of the company had become $20,000,000; and that the value of its assets amounted to about $35,000,-000. Eight and one-half million tons of anthracite, of the thirteen millions carried by the Railroad Company in 1913, were produced by this Coal Company and by Coxe Brothers & Company, Inc., owned, as we have seen, by the Railroad Company. The combined acreage of lands owned by the Coal Company and by Coxe Brothers & Company, Inc., is admitted to be 90,719 acres, of which 61,238 acres are located along the lines of the Railroad Company. The annual reports of the Coal Company show that in 1903 56.77% of the coal transported over the Railroad was produced by the Coal Company and its affiliated companies; that in 1906 the percentage produced and pur-

chased was 85.25% of that transported; and in 1907 it was 87.11%. The Interstate Commerce Commission found that in 1908 the company controlled 95% of the tonnage moving over its line to tidewater. *Meeker & Co.* v. *Lehigh Valley R. R. Co.*, 21 I. C. C. 129, 154.

The Railroad Company and the Coal Company had usually the same president, secretary, treasurer and auditor, and the latter company admits, as it must, that the Railroad Company "as the owner of stock controls and long since has been controlling the election of its directors." The Railroad Company constantly advanced large sums of money to the Coal Company for the purchase of property and for operating capital. The total of these advances to the year 1892 exceeded $15,500,000, which amount, however, was reduced by operations of the Coal Company to $11,500,000. The Coal Company never paid any dividends, its earnings being frankly treated as those of the Railroad Company, and the financial and other relations between the two companies were so intimate and interlaced that in argument it is admitted that "in the last analysis the assets of the Coal Company are the assets of the Railroad Company."

There is much more in the record to like effect, but sufficient has been stated to make it clear beyond controversy, that the Coal Company was organized and conducted as a mere agency or instrumentality of the Railroad Company, for the purpose of avoiding the legal infirmity which it was thought might inhere in the owning of coal lands and in the conducting of coal mining, shipping and selling operations by the Railroad Company, and that the policy of purchasing and leasing coal lands tributary to its lines for the purpose of controlling interstate trade and commerce in anthracite coal and of preventing and suppressing competition therein, was deliberately entered upon by the Railroad Company, and in combination with its agency, the Coal Company, was consistently pursued, with in-

creasing energy and scope after the passage of the Anti-Trust Act, until the commencement of this suit, unless these purposes and results, in point of law, were modified and cured by the organization in 1912 of the Sales Company and by the functions which it performed—which remain to be considered.

On January 11, 1912, the board of directors of the Railroad Company requested the directors of the Coal Company "to consider the propriety of organizing a coal sales company" and of entering into a contract with it when formed "for a limited time" for the purchase and sale by it "of the coal mined, purchased and owned by the Coal Company." The board also requested that the privilege of subscribing for the stock of the new company be extended, "not to the Railroad Company, but, pro rata, to the common and preferred stockholders of the Railroad Company." As if anticipating compliance with its request on the part of the Coal Company, of which it owned all of the stock, the officers of the Railroad Company were authorized at the same meeting of the board to take such action and make such conveyances as might be deemed necessary or advantageous in perfecting the sales arrangement with the new company to be organized, and in aid of the enterprise a dividend of ten per cent. on the stock of the Railroad Company was declared, payable on February 26, which amounted in the aggregate to $6,060,800.

On the same day the board of directors of the Coal Company resolved: that the new Sales Company should be organized, as requested by the Railroad Company, with a capital stock of $10,000,000, but that only $6,060,800 of it should be issued; that when the new company was formed the Coal Company should, "if possible," contract with it for a "limited time" for the sale to it "of all coal which shall be mined, purchased, owned or acquired" by the Coal Company during the term of the proposed contract, so that the title to such coal should vest in the Sales

Company. "before the transportation thereof shall be commenced."

The privilege of subscription to the capital stock of the new company was restricted to the stockholders of the Railroad Company.

The Sales Company was promptly organized and the minutes of the company show that slightly less than 97% of the stock was subscribed for by stockholders of the Railroad Company.

The Sales Company had seven directors. One of these, J. W. Skeele, who was also elected president, had been general sales agent of the Coal Company; another, W. R. Evans, had been assistant to the general sales agent of the Coal Company; another, L. D. Smith, was a director of the Railroad Company, and a fourth, Paul Moore, was a son of a large stockholder in the Railroad Company. The vice president of the company, G. N. Wilson, had been general auditor of the Railroad Company, and the treasurer, W. J. Burton, had been employed as assistant secretary of the Coal Company.

It is too plain for discussion that with a company thus organized and officered, the making of a contract by the Coal Company for the sale of all of its coal to the Sales Company was, in substance and effect, making a contract with itself, the terms of which it could determine in its discretion.

Immediately after the organization of the Sales Company, the anticipated contract between that company and the Coal Company for the purchase of all the coal which the latter might mine or purchase was entered into and bears date March 1, 1912. This contract was to continue for ten years unless terminated in the manner which it provides for, and its terms are so nearly identical with the earlier Lackawanna contract, which is considered in *United States* v. *Delaware, Lackawanna & Western R. R. Co.,* 238 U. S. 516, that the judge who tried this case below, with

entire propriety, says that the differences between the two
are "wholly unsubstantial" (225 Fed. Rep. 401). This
court held that the contract in the *Lackawanna Case* was
void because violative of the provisions of the Anti-Trust
Act and the Commodities Clause of the Act to Regulate
Commerce.

The discussion of the Lackawanna contract is so full and
satisfactory in 238 U. S. 516, that it would not serve any
useful purpose to comment in detail upon the contract
which we have here. It will suffice to say that the provi-
sions of the Lackawanna contract, which were clearly
determinative of the former decision by this court, are
plainly the same in substance, and almost exactly the
same in form, as those in the contract we are considering,
viz: The agreement (1) of the Coal Company to sell and of
the Sales Company to buy all of the coal mined by the Coal
Company from lands owned or leased by it, together with
all coal which it might purchase; (2) that the prices to be
paid for the more important grades of coal shall be sixty-
five per cent. of the New York prices—the two contracts
are in precisely the same words in this respect; (3) that,
with negligible exceptions, the Sales Company is to sell no
other coal, for itself or for any other, than that "pur-
chased" from the Coal Company; (4) that the Coal Com-
pany shall lease all of its facilities, structures and trestles
to the Sales Company; (5) that either party shall have the
right to abrogate and cancel the contract upon giving to
the other six months' notice of its desire so to do; (6) that
the Sales Company shall not buy coal except from the
Coal Company—a provision which excludes the Sales
Company, potentially a strong competitor, from the
market. The Coal Company purchased 2,960,000 tons of
coal in 1911 in addition to that which it mined.

These are the contract provisions which led this court, in
the former case, to hold that a corporation organized and
circumstanced as is the Sales Company which we have

here,—subject to be stripped at the will of another of all of its business and of all its facilities for carrying on the business for which it was incorporated—was neither an "independent buyer nor a free agent."

Being entirely satisfied with the reasoning upon which the *Lackawanna Case* proceeds to its conclusion, we hold now, as it was there in principle held: that the purchase in form by the Sales Company did not so dissociate the Railroad Company from the transportation of coal in which it was interested as to meet the requirements of the law, that the contract, nominally of purchase, was so calculated to restrain interstate trade as to be obnoxious to the Anti-Trust Act of Congress, and that for this reason it is unlawful and void.

It will be of service in determining the purposes of the defendant Railroad Company with its corporate subsidiaries in the activities thus discussed, to recall the history of the defendant Railroad Company, as it appears in the decisions of this and of other courts.

In 1892 the defendant Railroad Company and the Central Railroad Company of New Jersey leased their lines of railway for the term of 999 years to the Reading Railroad Company, a parallel competing carrier, extensively engaged in mining, marketing and selling anthracite coal. This combination, had it become operative, would have gone far toward monopolizing the interstate transportation and trade in anthracite coal of our entire country, but all operations under the lease of the Central Railroad Company of New Jersey were enjoined by the New Jersey courts, for the reason that it was deemed to be in restraint of trade, against public policy and calculated to partially destroy competition in the production and sale of anthracite coal, a staple commodity of the State. *Stockton* v. *Central R. R. Co.*, 50 N. J. Eq. 52. Thereupon the lease of defendant's property was abandoned and surrendered.

Six years later, in 1898, the defendant Railroad Company combined with the Reading and four other railway companies to contribute a large sum of money, which was successfully used to prevent the construction of a projected, competing line of railroad from the anthracite fields to tidewater. Of this enterprise this court said: "We are in entire accord with the view of the court below in holding that the transaction involved a concerted scheme and combination for the purpose of restraining commerce among the States in plain violation of the Act of Congress of July 2, 1890." *United States* v. *Reading Co.*, 226 U. S. 324, 355.

Four years later, in 1902, the defendant Railroad Company united with the Reading and four other anthracite carriers in a combination to control the entire tonnage of coal produced by independent operators along the lines of their respective railways. The device this time resorted to was a contract to purchase all the coal produced by independent mines, then opened or which might thereafter be opened by the vendors, and to pay therefor sixty-five per cent. of the market price prevailing at tidewater points at New York, to be computed from month to month by an arbitrator to be selected by agreement. These contracts were elaborately considered and unsparingly condemned by this court in the case which is cited, and the conclusion reached was that the defendants in that case had unlawfully combined, by and through the instrumentality of the sixty-five per cent. contract, for the purpose of controlling the sale at tidewater of the independent output of anthracite coal. The contracts were declared to be unlawful and were ordered cancelled. 226 U. S. 370, 371, 373.

In 1911, in *Meeker & Co.* v. *Lehigh Valley R. R. Co.*, 21 I. C. C. 129, 154, 163, the Interstate Commerce Commission held that the only line of demarcation between the Lehigh Valley Railroad Company and the Lehigh Valley Coal Company was one of bookkeeping; that the Rail-

road Company had "monopolized the coal field served by it" and that it had been guilty of unjust discrimination and of charging unreasonable rates for which reparation was awarded. 23 I. C. C. 480. This decision was sustained by this court in *Meeker & Co.* v. *Lehigh Valley R. R. Co.*, 236 U. S. 412.

And yet again, in 1915, the Interstate Commerce Commission, after an investigation extending over three years, in which the defendant Railroad Company and all other initial carriers of anthracite were parties, held that the rates charged by the defendant and other carriers to tidewater and to certain interior points were unreasonable; that by trackage and other arrangements they had extended advantages to their subsidiary coal companies, to the prejudice of other shippers; and that concessions as obnoxious as "direct cash rebates" had been made to such coal companies. *In the Matter of Rates, Practice, Rules, and Regulations Governing the Transportation of Anthracite Coal*, 35 I. C. C. 220.

This history of almost twenty-five years casts an illuminating light upon the intent and purpose with which the combination here assailed was formed and continued. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 76.

Without further comment, this discussion of the record requires us to conclude that it is clearly established that prior to the enactment of the Anti-Trust Act, the Railroad Company, in combination with its coal company subsidiary, deliberately entered upon a policy of making extensive purchases of anthracite land tributary to the Railroad Company's lines, for the purpose of controlling the mining, transportation and sale of coal to be obtained therefrom and of preventing and suppressing competition, especially in the transportation and sale of such coal in interstate commerce, and that this policy was continued after the passage of the Anti-Trust Act with increasing energy and tenacity of purpose, with the result that a

practical monopoly was attained of the transportation and sale of anthracite coal derived from such lands.

The area of the anthracite territory is so restricted that to thus obtain control of the supply of such coal on a great system of railway (the amount transported exceeded one-fifth of the entire production of the country for the year before this suit was commenced) by a combination of corporations, such as we have here, and by such methods as we have seen were employed, effected a restraint of trade or commerce among the several States and constituted an attempt to monopolize and an actual monopolization of a part of such trade or commerce in anthracite coal, clearly within the meaning of the first and second sections of the Anti-Trust Act as they have frequently been interpreted by this court. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 61; *New York, New Haven & Hartford R. R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361, 392, 393; *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61; *International Harvester Co.* v. *Missouri,* 234 U. S. 199, 209; *United States* v. *Delaware, Lackawanna & Western R. R. Co.,* 238 U. S. 516, 533; *United States* v. *Reading Co.,* 253 U. S. 26.

Since we have also found that the contract between the Coal Company and the Sales Company was a mere device to evade the Commodities Clause of the Interstate Commerce Act and therefore void, it results that the decree of the District Court must be reversed and the case remanded with instructions to enter a decree, in conformity with this opinion, dissolving the combination effected through the intercorporate relations subsisting between the Lehigh Valley Railroad Company, the Lehigh Valley Coal Company, Coxe Brothers & Company, Inc., the Delaware, Susquehanna & Schuylkill Railroad Company and the Lehigh Valley Coal Sales Company, with such provisions for the disposition of all shares of stock, bonds, or other evidences of indebtedness, and of all property

of any character, of any one of said companies owned or in any manner controlled by any other of them as may be necessary to establish their entire independence of and from each other. The contract of March 1, 1912, between the Coal Company and the Sales Company must be decreed to be void and all contract relations between the two companies enjoined which would serve in any manner to render the Sales Company not entirely free to extend its business of buying and selling coal where and from and to whom it chooses with entire freedom and independence, so that it may in effect, as well as in form, become an independent dealer in coal, and free to act in competition, if it desires, with the defendant Coal Company or Railroad Company.

As to the New York & Middle Coal Field Railroad & Coal Company, the G. B. Markle Company, the Girard Trust Company and the individual defendants, the bill must be dismissed.

*Reversed and remanded with instructions to enter a decree in conformity with this opinion.*

THE CHIEF JUSTICE and MR. JUSTICE HOLMES, while if they exercised an independent judgment would be for affirmance, nevertheless concur in the conclusion now announced by the court because they consider that they are so constrained to do in virtue of the controlling effect of the previous decisions in the *Lackawanna* and *Reading Cases* cited in the opinion of the court.

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BRANDEIS did not take part in the consideration and decision of this case.