## CONTINENTAL OIL CO. v. JONES,
### Collector of Internal Revenue.
### No. 6287.

District Court, W. D. Oklahoma.

Feb. 16, 1939.

Wm. H. Zwick and A. L. Hull, both of Ponca City, Okl., for plaintiff.

Milford S. Zimmerman, Sp. Asst. to Atty. Gen., and Wade H. Loofbourrow, Asst. U. S. Dist. Atty., of Oklahoma City, Okl. (Andrew D. Sharpe and Larkin H. Jennings, Jr., Sp. Assts. to Atty. Gen., and Wm. C. Lewis, U. S. Dist. Atty., of Oklahoma City, Okl., on the brief), for defendant.

VAUGHT, District Judge.

The plaintiff has instituted this action against the defendant as Collector of Internal Revenue, and in the petition alleges that on the 21st day of June, 1932, there became effective the Revenue Act of 1932 which provided for the imposition of a tax of one cent per gallon on gasoline and four cents per gallon on lubricating oils manufactured, produced or imported into the United States, and that said tax would be imposed upon all gasoline and lubricating oils owned by manufacturers, producers or importers on said date of June 21, 1932; that said Act was amended by the

Act of June 16, 1933, by increasing the tax of one cent a gallon on gasoline to one and a half cents; that on the 14th day of August, 1935, the defendant made an assessment against the plaintiff for the tax on the amount of gasoline and oils which defendant claimed was owned by the plaintiff on June 21, 1932, and on June 16, 1933, respectively; that this assessment was vigorously protested by the plaintiff and certain refunds were allowed, and the tax was finally paid, under protest, in accordance with the defendant's assessment, less the refunds, which sum together with interest paid by the plaintiff amounts to $699,131.82 and for which this action is brought.

The plaintiff alleges that the basis of this tax was certain stocks of gasoline and lubricating oils which defendant contends plaintiff had in its possession, as a manufacturer and producer, on the dates that the acts hereinbefore referred to became effective.

The plaintiff alleges that said entire sum was illegally, erroneously and wrongfully assessed and collected, and prays judgment, accordingly.

The defendant has answered, admits the assessment was made and collected but denies that said assessment and collection were wrongfully, erroneously and illegally made, and alleges in its answer that on the dates said Revenue Acts became effective, said plaintiff had in its possession, as a manufacturer and producer, and was the owner of the stocks of gasoline and lubricating oils upon which the assessment was actually made in accordance with the provisions of said acts of Congress, and prays that the plaintiff be denied any relief.

This case was tried to the court and has been carefully briefed. The court has had an opportunity to re-examine the entire record and to give careful consideration to the briefs filed. There is really little conflict as to the evidence in this case. There has been no attempt on the part of the plaintiff to conceal any fact connected with this transaction.

The record discloses the following state of facts:

The Revenue Act of 1932, Chap. 209, 47 Stat. 169, 259, 266, provides in part as follows:

"Sec. 601. * * * (c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer:

"(1) Lubricating oils, 4 cents a gallon; but the tax on the articles described in this paragraph shall not apply with respect to the importation of such articles." 26 U.S.C.A. end of c. 20.

"Sec. 617. Tax on Gasoline.

"(a) There is hereby imposed on gasoline sold by the importer thereof or by a producer of gasoline, a tax of 1 cent a gallon, except that under regulations prescribed by the Commissioner with the approval of the Secretary the tax shall not apply in the case of sales to a producer of gasoline.

"(b) If a producer or importer uses (otherwise than in the production of gasoline) gasoline sold to him free of tax, or produced or imported by him, such use shall for the purposes of this title be considered a sale.

"(c) As used in this section—

"(1) the term 'producer' includes a refiner, compounder, or blender, and a dealer selling gasoline exclusively to producers of gasoline, as well as a producer.

"(2) the term 'gasoline' means gasoline, benzol, and any other liquid the chief use of which is as a fuel for the propulsion of motor vehicles, motor boats, or aeroplanes." 26 U.S.C.A. end of c. 20.

Said Section 617 was amended by the National Industrial Recovery Act of 1933, Chap. 90, 48 Stat. 195, 206, as follows: "Sec. 211. (a) Effective as of the day following the date of the enactment of this Act, section 617 (a) of the Revenue Act of 1932 is amended by striking out '1 cent' and inserting in lieu thereof '1½ cents'."

The plaintiff is engaged in the production, manufacture and sale of gasoline, lubricating oils and other petroleum products. It is a Delaware corporation with its principal place of business in Ponca City, Oklahoma. Its officers and directors as of June, 1932, were as follows:

President: Dan Moran; Vice-Presidents: W. W. Bruce, W. H. Ferguson, Walter Miller, E. J. Nicklos, E. S. Karstedt; Secretary: J. J. Cosgrove; Treasurer: G. F. Smith; Directors: Dan Moran, W. W. Bruce, W. H. Ferguson, Arthur B. Lawrence, Carl H. Forscheimer, W. B. Griffin, George Whitney, W. C. Potter, Thomas E. Lamont.

The Continental Oil Company of Nevada was a wholly owned subsidiary of the plaintiff. It had an authorized capitalization of twenty shares of stock at $100 per share par value but of this capital stock only five shares were issued, they having been issued to the plaintiff. The Continental Oil Company of Nevada was incorporated on October 28, 1929, and its officers and directors in June, 1932 were as follows:

President: W. W. Bruce; Vice-Presidents: B. H. Markham, G. F. Smith; Secretary: A. C. Frazer; Treasurer: G. F. Smith; Asst. Secretary: R. A. Onstat; Directors: W. W. Bruce, G. F. Smith, B. H. Markham.

Conoco Oil Company of Delaware was organized in 1929 under the laws of Delaware. The principal reason for its incorporation was that another company had already registered the name "Continental" in Illinois, Kentucky, and Indiana and the plaintiff had attempted to purchase the name "Continental" in those states but was unsuccessful. From the time of its organization in 1929 until its dissolution in 1935, Conoco's outstanding stock was owned entirely by the plaintiff. Its officers and directors in June, 1932 were as follows:

President: Dan Moran; Vice-Presidents: W. W. Bruce, E. S. Karstedt, G. F. Smith, George A. Wood; Secretary: A. C. Frazer; Treasurer: G. F. Smith; Asst. Secretaries: N. P. Farr, J. E. Harvey; Asst. Secretary and Asst. Treasurer: R. E. Onstat; Directors: W. W. Bruce, E. S. Karstedt, W. H. Ferguson, Dan Moran, G. F. Smith.

In this opinion the plaintiff, Continental Oil Company of Delaware, will be referred to as "Continental"; the Continental Oil Company of Nevada will be referred to as "Nevada"; and, the Conoco Oil Company of Delaware will be referred to as "Conoco".

On the 20th day of June, 1932, the day before the Revenue Act of 1932 became effective, Continental transferred to Nevada, 33,693,179 gallons of gasoline and 5,185,633¼ gallons of lubricating oils at a total price of approximately $3,500,000. On the same date, June 20, 1932, Continental transferred to Conoco, 18,407,760 gallons of gasoline, the total price being approximately $1,243,000. The Revenue Act of 1932 was passed by Congress on the 6th of June, 1932, with the provision that

it become effective on the 21st day of June, 1932.

On June 17, 1933, immediately prior to the effective date of the amendment to the Revenue Act providing for an increase of tax of one-half cent per gallon on sales of gasoline by producers, Continental transferred to Conoco about 8,000,000 gallons of gasoline and it is stipulated that the circumstances surrounding this latter transfer were similar to the circumstances surrounding the transfers of June 20, 1932.

The transfers of gasoline from Continental to Nevada and Conoco on the 20th of June, 1932, were by bills of sale by Continental to the subsidiary companies, respectively.

The record further discloses that Nevada was organized as a holding company and to protect Continental in the use of its name in certain western states. It had never had any gasoline or oil inventories; it did not have any facilities for marketing gasoline or oil; it had no assets of any description except certain stocks which Continental had transferred to it on open account and the purchase price for which was charged to Nevada upon the books of Continental. The transfer of June 20, 1932, to Nevada was the first and only instance of its kind since Nevada had never received any gasoline or oil inventory before that date.

It will be noted that the officers and boards of directors were practically the same in all three of these corporations. The same officers performed almost identically the same service for all of the companies. All three had the same treasurer and the same general attorney. The main offices of all of these companies were in the office of Continental at Ponca City, Oklahoma.

The Great Lakes Pipe Line Company, hereinafter referred to as "Great Lakes", is a common carrier serving principally proprietary companies in the transportation and storage of gasoline products. In June, 1932, Continental owned approximately thirty-one per cent of the stock of Great Lakes, and Dan Moran, the president of Continental and Conoco, was also president of Great Lakes. The vice-president and general manager, and the secretary and treasurer were former employees of Continental.

The record discloses that there was a meeting of Nevada's Board of Directors.

on the 20th of June, 1932, and so far as the books and records are concerned, the transaction was regular upon its face.

Great Lakes connected the Mid-Continent field and particularly Ponca City, where the plaintiff's refineries are located, with Kansas City and Chicago.

At the time of the transfer of the stocks of gasoline and oils to Nevada, said stocks were located in Great Lakes storage to the credit of Continental and in storage belonging to Continental. On the same date, June 20, 1932, Nevada entered into a contract with Continental whereby Nevada was to use all of the facilities of Continental and its employees, to sell at retail the stocks of gasoline and oils which it had purchased from Continental and said gasoline and oils were disposed of through the facilities of Continental for which Continental charged Nevada a commission. While the bill of sale was authorized by Continental and accepted by Nevada through the action of its Board of Directors, no meeting of the Board of Directors of Conoco was called to authorize the transfer to it on June 20 but a bill of sale was executed by Continental to Conoco. The record further discloses that prior to this transaction, Conoco had never owned any inventory in Great Lakes. The officers who handled all of these negotiations and transfers were officers of all three companies.

It is admitted that the stocks of gasoline and oils, after these bills of sale were executed, remained in the same depositories and pipe lines as before the execution of the bills of sale.

On June 20, 1932, Great Lakes was notified by Continental through a teletype message of the transfer to Conoco.

The records of Great Lakes showed that the stocks of gasoline and oils in its pipe line, covered by the bills of sale, remained in the name of Continental. That is, the records of Great Lakes still showed Continental as the owner of the inventories even after the execution of the bills of sale.

The record further shows that Conoco's vice-president in charge of its sales had no part in planning the transfer to it in June, 1932, and was not advised of the transfer until after it had become effective.

Prior to this transaction on June 20, 1932, Conoco had always had its orders filled by making requisitions on Continental.

On May 31, 1932, Conoco had total assets with a book value of $1,765,000; liabilities to Continental of $2,325,000; and a deficit of $745,000. On June 30, 1932, the deficit had increased to $902,000; and on December 31, 1932, the deficit had further increased to $1,218,000.

It is admitted that the needs of Conoco on June 20, 1932, and thereafter, were practically the same as prior thereto. The supply and movements of gasoline and lubricating oils for both Continental and Conoco were controlled prior to this transfer, by the order and distribution division of Continental. After the transactions on June 20, 1932, the order and distribution division and the marketing division of Continental operated on behalf of all three companies and orders from Conoco were honored by Great Lakes even after the Conoco stock in Great Lakes had been exhausted and Continental's order and distribution division supplied Conoco with either Continental or Nevada stock, and adjustments were made subsequently on the books.

Mr. Ward, the general manager of Great Lakes, advised Continental on June 24, 1932, that the transfers from Continental to Conoco and Nevada were regarded as intercompany transactions and had no effect on the records of Great Lakes. The only records which would disclose the ownership of the stocks of gasoline and oils in Great Lakes by the various companies were the records kept by Continental at its Ponca City office.

Continental, after June 1932, continued to draw from the stocks in Great Lakes which it had sold to Conoco, in order to supply its own demands and that of Nevada. There was little if any difference in the control which Continental exercised over the stocks in Great Lakes prior to June, 1932, and thereafter.

After the transfers in June, 1932, Continental directed the blending of the stock of gasoline held in Great Lakes in accordance with the specifications of the marketing committee of the proprietary companies, among whom was neither Conoco nor Nevada. Ordinarily, blending and mixing was ordered by Continental without authority from either Conoco or Nevada, who were not connected with the blending transaction and who received no profit from it.

Prior to the transfer, Continental had never made any allocation of overhead expenses to Nevada. The salaries of the

employees in the order and distribution division and the marketing division were all paid by the checks of Continental. Prior to the transfer, Conoco was shown on the books of Continental as the Chicago division of Continental.

In stating the uncontroverted facts, the court has used the almost identical words contained in the briefs herein.

In considering the evidence as introduced, it is apparent that neither Nevada nor Conoco was in any financial position whatever to purchase the inventories transferred to them by Continental. In fact, Nevada existed only in name. Its officers were officers of Continental. It never owned a dollar of assets except in the nature of credit extended it by Continental. It is true that $500 of its capital stock was sold which was purchased and owned by Continental. It was admitted by the plaintiff in the trial of this cause, that the sole purpose for the creation of Nevada was to protect the name Continental in certain western states. With liabilities of approximately $1,000,000 to Continental on June 20, 1932, this transaction involved the extension of an additional credit to Nevada of more than $3,500,000. The stocks of gasoline and oils never did leave the control of Continental and the only indication or evidence of a sale were the bookkeeping entries in the office of Continental and the contracts executed between the two corporations. The only hope that Continental could have of receiving compensation for the stocks of gasoline and oils which it sold to Nevada by this transaction, was from the sale of the same stocks through the facilities of Continental. Nevada was not even a marketing company and as hereinbefore stated, it had absolutely no facilities with which to market this large stock of gasoline and oils. Nevada never received any benefits from this transaction whatever except bookkeeping entries of a credit of approximately $250,000 on its indebtedness to Continental existing prior to June 20, 1932.

What then was the motive prompting Continental to enter into this transaction? It is not left for the court to guess. Continental admits frankly that its sole purpose in attempting to make this sale was to avoid the tax which it would be required to pay on these same stocks of gasoline and oils if found in its possession on June 21, 1932.

The court does not question the right of Continental to dispose of these stocks of gasoline and oils. So far as the Revenue Act of 1932 was concerned, Continental had a right to give away these stocks. It could make any kind of a disposition that it desired to make. It could have sold them for any price it desired, and if it had transferred these stocks to Nevada in such a way as to deprive itself of any future control thereover, a very different question would present itself.

■ It not only is not an offense but it is not even dishonorable to avoid the payment of an excessive or unjust tax. Neither is a taxpayer to be criticized for so handling his business (so long as his acts are legal), that the amount of taxes which he may be required to pay is reduced to the minimum. If it was the purpose of Continental to absolutely divest itself of the ownership of the stocks of gasoline and oils involved herein, in order to avoid the payment of the tax which would become due and payable on June 21, 1932, if these stocks were then owned by Continental, it had a perfect right so to do.

The same reasoning applies to Conoco. Continental could not file the name Continental Oil Company and operate thereunder in certain of the Great Lakes states and Conoco was organized, as hereinbefore stated, in order to permit the operation in those states by Continental. Prior to June 20, 1932, on the books and records of Continental in Ponca City, Conoco was treated merely as the Chicago division of Continental, and the supply of gasoline and oils needed by Conoco, in filling its demands in those states where it operated, was filled by requisitions on Continental just as the supply of all other divisions of Continental was provided. Aside from the bookkeeping entries in the office of Continental, where the books of all three companies were kept, there was little or no difference in the manner in which sales were made by Conoco after June 20, 1932, and prior thereto.

The question then presenting itself is whether or not these transactions between Continental and Nevada, and Continental and Conoco constituted bona fide sales which would be recognized in the ordinary course of business. In other words, we have a parent corporation dealing with wholly owned subsidiaries, said subsidiaries having no assets except the credit extended them by the parent corporation, having practically the same officers, and with books and records kept by the same individuals.

Continental sold said subsidiaries more than five million dollars worth of gasoline and oils with no expectation of receiving pay therefor except from the sale of the identical gasoline and oils sold, and retained at least such a control over said products so sold as would permit the parent company to direct the future disposition of said products, the price at which they were to be sold, and the collection and disposition of the proceeds therefrom.

The record in this case discloses that Nevada never received one cent from the sale of these stocks of gasoline and oils nor had said proceeds placed to its own credit independent of the control of Continental. Practically the same situation existed with reference to Conoco.

The record also discloses that on June 21, 1932, under the direction of the officers of Continental, the retail price of gasoline was increased one cent a gallon and that, in the course of the transaction, this increase of one cent inured to the benefit of Continental.

It is contended very vigorously by the plaintiff that both Nevada and Conoco were corporate entities and that the dealings made between them and Continental were made at "arm's length."

These questions have been passed upon by our courts and it is only necessary to review certain of these decisions to reach the conclusion that a wholly owned subsidiary corporation may be a corporate entity and at the same time be a mere instrumentality of the parent corporation to carry its purposes into effect.

In Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, the court said:

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into ex-

istence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.

"In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of subdivision (B) [section 112(i) (1), 26 U.S.C.A. § 112(g) (1) (B)], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

In Phelps v. Commissioner, 7 Cir., 54 F.2d 289, 291, certiorari denied, 285 U.S. 558, 53 S.Ct. 458, 76 L.Ed. 946, the court said:

"If, under the facts stated, we are bound by the plain meaning of the language employed in the resolution referred to in the statement of facts, then of course the transactions in controversy should be considered as sales, for that is what the resolution termed them, and pursuant thereto there was an exchange of stock for money. But in all relations of life it oftentimes happens that the thing done speaks so audibly that equity is prevented from hearing the language of the parties, and will classify the act by its real name rather than by the name which the interested parties have given it. In such instances the substance of the transaction will control the form, and the Board therefore was warranted in considering both form and substance in arriving at its conclusion. United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; United States v. Klausner (C.C.A.) 25 F.2d 608.

"That taxing statutes cannot be intentionally circumvented by anticipatory arrangements and contracts is settled by the principle laid down in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731."

In Commissioner v. Riggs, 3 Cir., 78 F.2d 1004, 1005, certiorari denied 296 U.S. 637, 56 S.Ct. 171, 80 L.Ed. 453, the court said: "From the opinion in the Gregory Case, it is clear that while motive to escape taxation may be of no importance, if

the methods used are in reality those intended by the law, it is not always enough that the letter of the taxing statute is followed. The decisive thing is whether or not what has been done is 'the thing which the statute intended.' The taxpayer must bring himself within the intent of the statute upon which he relies, and in the case at bar the taxpayers did not do so. They did not undergo business losses such as are actually contemplated in the statute, but conceived the losses in paper transactions in order to escape the burden of their tax liability."

In Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474, the Supreme Court of the United States, in an opinion by Mr. Justice Sutherland, expressly reaffirms the principles stated in Gregory v. Helvering, supra.

In Morsman v. Commissioner, 90 F.2d 18, 22, 113 A.L.R. 441, the Eighth Circuit Court of Appeals said: "When a taxpayer thus boldly proclaims that his intent, at least in part, in attempting to create a trust is to evade taxes, the court should examine the forms used by him for the accomplishment of his purpose with particular care; and, if his ingenuity fails at any point, the court should not lend him its aid by resolving doubts in his favor."

The foregoing authorities are cited to show that a motive may be absolutely legal and not subject to criticism but when that motive calls for the performance of acts of a corporation or its officers, there must be no question as to whether or not those acts were fully performed. In other words, this court assumes that Continental had the right and the power to sell these stocks of petroleum products in any manner that it saw fit but the sale must be such a sale as would meet the strongest test of validity.

It is contended by the plaintiff that Nevada and Conoco had full control of these stocks of gasoline and oils after this transaction was completed and that the contracts of sale were complete within themselves.

It is admitted, however, that after the alleged sale to Nevada and Conoco every order, with reference to retail price and disposition of gasoline and oils, was made in the office of Continental by officers acting for all three corporations.

When the acts of a wholly owned subsidiary are the result of direction by an officer acting for the parent and subsidiary, and apparently, are entirely for the benefit of the parent corporation, it cannot be said that the subsidiary is acting at "arm's length."

In J. J. McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 391, 54 L.Ed. 590, that court said: "A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose."

In The Willem Van Driel, Sr., 4 Cir., 252 F. 35, 39, that court said: "It would be impossible to imagine a relationship between corporations where the subsidiary corporation was more completely under the control of the dominant corporation. * * * Such complete dominance and control by the railroad company made the elevator company its mere puppet."

In Wabash Ry. Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335, 343, that court said: "If corporations carry on part of their business through subsidiary companies, it makes little difference what such companies may be called; there is no particular divinity surrounding the term 'corporation.' The courts will look through the form to get at the real intent of the association of individuals or corporations forming the organization, and * * * will give effect to the real purpose of the organization in order to promote square dealing and effectuate justice."

In Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487, certiorari denied, 296 U.S. 614, 56 S.Ct. 134, 80 L.Ed. 435, the court said:

"Few questions of law are better settled than that a corporation is ordinarily a wholly separate entity from its stockholders, whether they be one or more. In re Collins, 75 F.2d 62 (C.C.A.); Wilson v. Crooks (D.C.) 52 F.2d 692; Majestic Co. v. Orpheum Circuit, Inc. (C.C.A.) 21 F.2d 720; Owl Fumigating Corporation v. California Cyanide Co. (D.C.) 24 F.2d 718, loc. cit. 719; Pullman's Palace-Car Co. v. Missouri Pacific Ry. Co., 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499. Likewise, we think it must be conceded that neither ownership of all of the stock of one corporation by another, nor the identity of officers in one with officers in another, creates a merger of the two corporations into a single entity, or makes one either the principal or agent of the other. Owl Fumigating Corp. v. California Cyanide Co. [supra]; Corsicana Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82,

64 L.Ed. 141; Marsch v. Railroad, 230 Mass. 483, 120 N.E. 120; Richmond & I. Const. Co. v. Richmond, etc., Ry. Co. (C.C.A.) 68 F. 105, 34 L.R.A. 625. But notwithstanding such situation and such intimacy of relation, the corporation will be regarded as a legal entity, as a general rule, and the courts will ignore the fiction of corporate entity only with caution, and when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud.

"But, notwithstanding this, we are constrained by the uncontradicted facts to the conclusion that the sales company was, as it was controlled, and as it functioned, merely an agency or department of the lumber company. All of its assets were furnished, and all of its stock owned by the lumber company, its officers, directors, and its main office were the same as those of the lumber company, and its employees had, for the most part, formerly been employees of the lumber company. But the strongest undisputed facts constraining us to this conclusion are that the president of the lumber company had the power to vote all of the stock of the sales company, and aside from this power, which was not of itself unusual, had the power to remove any officer or director of the sales company without cause or notice, and to dominate and control performance of its contracts. Moreover, the sales company did nothing not theretofore done by the lumber company, which in forming it only split its business into a manufacturing department which it retained, and a sales department which it transferred to the sales company, but over which it retained thoroughgoing, ultimate control. Trustees System Co. of Pennsylvania v. Payne (C.C.A.) 65 F.2d 103; Page v. Arkansas Natural Gas Corp. (C.C.A.) 53 F.2d 27; Industrial Research Corp. v. General Motors Corp. (D.C.) 29 F.2d 623; Hamilton Ridge Lumber Sales Corp. v. Wilson (C.C.A.) 25 F.2d 592; Detroit Motor Appliance Co. v. General Motors Corporation (D.C.) 5 F.Supp. 27; Edward Finch Co. v. Robie (C.C.A.) 12 F.2d 360; United States v. Lehigh Valley R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253."

In Gulf, C. & S. F. Ry. Co. v. Cities Service, 281 F. 214, 215, the District Court of Delaware said: "Unquestionably mere stock ownership does not make the stockholder responsible for the obligations of a corporation. * * * But it is equally true that, where stock ownership is resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner of a stockholder, but for the purpose of so controlling a subsidiary company that it becomes a mere agency of the owning company, the latter company may not escape liability for the acts of the subsidiary company."

The same question was involved in Southern Pacific Co. v. Lowe, 247 U.S. 330, 337, 38 S.Ct. 540, 543, 62 L.Ed. 1142, in which the court said: "While the two companies were separate legal entities, yet in fact, and for all practical purposes they were merged, the former being but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control."

In Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229, the court said: "While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of the corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. United States v. Lehigh Valley R. R. Co., 220 U.S. 257, 273, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438. In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

In Centmont Corp. v. Marsch, 1 Cir., 68 F.2d 460, 466, certiorari denied, 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068, the question, as to the extent that a subsidiary becomes merely an instrumentality of the parent company, was discussed at length, and in concluding the opinion the court said: "It would be difficult to conceive of any more complete domination of one corporation by another and still maintain a separate corporate existence than is shown in this record."

In Maloney Tank Manufacturing Co. v. Mid-Continent Petroleum Corp., 49 F.2d 146, 150, the Tenth Circuit Court of Appeals, speaking through Judge McDermott, said: "The doctrine of corporate entity may be disregarded if it is apparent that a wrongdoer is undertaking to use it to play hide and seek with an injured party. Boatright v. Steinite Radio Corporation (C.C.A. 10) 46 F.2d 385."

The same holding is emphasized in Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133, in which the court said: "But, disregarding the forms gone through, the result was merely that the petitioner became the holder of the debts previously due from one of its companies to another. * * * It is true that the petitioner and its subsidiaries were distinct beings in contemplation of law, but the fact that they were related as parts of one enterprise, all owned by the petitioner, that the debts were all enterprise debts due to members, and that the dividends represented earnings that had been made in former years and that practically had been converted into capital, unite to convince us that the transaction should be regarded as bookkeeping rather than as 'dividends declared and paid in the ordinary course by a corporation.'" Cf. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L. Ed. 1348.

A very interesting case in which practically every question that has been raised in the case at bar was involved, is that of Bourjois, Inc., v. McGowan, D.C., 12 F. Supp. 787, 789, affirmed, 2 Cir., 85 F.2d 510, certiorari denied, 300 U.S. 682, 57 S.Ct. 753, 81 L.Ed. 885, in which the court said:

"Sales between a manufacturing company and sales corporations in which such manufacturing company owns all of the stock are not ipso facto 'not at arm's length.' Whether they are not at arm's length raises a question of fact.

.* * .* * * *

"Except for the keeping of separate books of account, the business of the three corporations was carried on largely as the business had been prior to September, 1932. The same business location and quarters were utilized. The same employees as theretofore continued in employment. The sales manager for both sales corporations continued as assistant treasurer of the three corporations. It seems to me that the presumption that these transactions were not at arm's length has not been met

or overcome. In law it resulted in nothing more than carrying on the old business by a changed method.

* * * * * *

"However, the preceding finding fails to take into consideration the fact that the plaintiff is the sole stockholder in the sales corporations, controls the policies thereof, and dictates the prices at which they shall resell the plaintiff's products. A corporation and its stockholders are generally to be treated as separate entities. Cannon Mfg. Co. v. Cudahy Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399. Ordinarily, corporations are to be regarded as separate entities even though their stockholders are the same or when one corporation owns all of the stock of the other. However, the fiction of separate identity will not be adhered to when one corporation, organized, owned, and controlled by another, is so managed as to make it merely an instrumentality or adjunct of such other corporation. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; Martin v. Development Co. (C.C.A.) 240 F. 42; and In re Watertown Paper Co. (C.C. A.) 169 F. 252. 'The objects of the statute are not to be defeated by mere forms of transactions.' Metropolitan Holding Co. v. Snyder (C.C.A.) 79 F.2d 263, 266 [103 A.L.R. 912]. Such is the situation in the instant case. The sales corporations were organized and all stock therein is owned by the plaintiff. There could be no other finding than that the plaintiff controls the policies of the sales corporations and dictates the prices at which their sales are made. The sales corporations were merely agents of the plaintiff. Palmolive Manufacturing Co. (Ontario) Ltd. v. The King, Canada Law Reports 1935, 131. Sales by the sales companies were really sales of the plaintiff. Advertising and sales promotion, ostensibly carried on by the sales corporations, were, indirectly, the work of the plaintiff. Bourjois, Inc., from whom alone Bourjois and Barbara Gould products can be obtained, is thus found to be selling its products at the prices charged by the sales corporations.

* * * * * *

"Plaintiff asserts that it has not collected these additional taxes. After the merger, the catalogues of the sales corporations

listed the goods at the same prices at which they had previously been listed in the catalogues of Bourjois, Inc., and Barbara Gould, Limited, and stated that the prices indicated included the tax, as had the previous catalogues. The tax included in making up the price lists for the previous catalogues undoubtedly was computed on the basis of the selling prices of Bourjois, Inc., and Barbara Gould, Limited, which prices would correspond closely to the present selling prices of the sales corporations less the amount added to cover the tax. It is to be assumed, therefore, that the prices now charged by the sales corporations include an amount equal to the tax computed on the selling price of the sales corporations, which price has been determined to be the selling price of the plaintiff, the manufacturer. It is evident that the sales corporations have collected the tax not only on the price at which the plaintiff sold to them, but also on the difference between such price and the price at which the goods were offered for resale by them. Bourjois, Inc., itself has not collected the additional tax. The sales corporations have. The effect is the same as though plaintiff had collected it.

"Section 621(d) of the Revenue Act of 1932, 26 U.S.C.A. § 1481 note [end of c. 20], provides: 'No overpayment of tax * * * shall * * * be refunded * * * unless the person who paid the tax establishes * * * (1) that he has not included the tax in the price of the article, * * * or (2) that he has repaid the amount of the tax to the ultimate purchaser.' The purchaser having paid the tax, the plaintiff sustained no loss. United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S. Ct. 443, 78 L.Ed. 859."

In Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916, the Supreme Court, speaking through Mr. Justice Holmes, said: "But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."

■ It is admitted in this case, as hereinbefore stated, that the price of gasoline was raised one cent on June 21, 1932 and since the only one of the three corporations that could in the final analysis profit by the transaction of June 20, 1932, was Continental, this court is forced to the conclusion that Continental not only sought to avoid the payment of the tax to which it would

be subjected on June 21, 1932, but it provided for an increase in the retail price of gasoline of one cent per gallon over and above what it had been receiving immediately prior to June 20, 1932.

It is the contention of the plaintiff that this was done in order to meet competition. It is immaterial for what purpose it was done as Continental profited thereby to the extent of one cent a gallon. A very serious question is raised by the defendant as to whether or not Continental could collect an amount equivalent to the tax from the consumer and hold it without the actual payment of the tax to the government. This is referred to by the court as "unjust enrichment."

In Stone v. White, 301 U.S. 532, 57 S. Ct. 851, 852, 81 L.Ed. 1265, the court said: "Its use to recover upon rights equitable in nature to avoid unjust enrichment by the defendant at the expense of the plaintiff, and its control in every case by equitable principles, established by Lord Mansfield in Moses v. Macferlan, 2 Burr. 1005 (K.B. 1750), have long been recognized in this Court. See Nash v. Towne, 5 Wall. 689, 702, 18 L.Ed. 527; Gaines v. Miller, 111 U. S. 395, 397, 4 S.Ct. 426, 28 L.Ed. 466; Atlantic Coast Line R. Co. v. Florida, 295 U. S. 301, 309, 55 S.Ct. 713, 716, 79 L.Ed. 1451. It is an appropriate remedy for the recovery of taxes erroneously collected, Elliott v. Swartwout, 10 Pet. 137, 156, 9 L.Ed. 373; Cary v. Curtis, 3 How. 236, 246, 250, 11 L.Ed. 576. The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. United States v. Jefferson Electric Co., 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859. Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, Moses v. Macferlan, supra, at page 1010; Myers v. Hurley Motor Co., 273 U.S. 18, 24, 47 S.Ct. 277, 278, 71 L.Ed. 515, 50 A.L.R. 1181; cf. Winchester v. Hackley, 2 Cranch 342, 2 L.Ed. 299, even without resort to the modern statutory authority for pleading equitable defenses in actions which are more strictly legal, Jud. Code, § 274b, 28 U.S.C. § 398 (28 U.S.C.A. § 398)."

Many cases are cited both by plaintiff and defendant which are merely cumulative

and this court has referred only to such decisions as have discussed the principles involved and has not attempted to analyze each case but has merely stated the conclusions.

The court agrees with every contention of the plaintiff except on the question of control and the right to recover under the theory of "unjust enrichment." No fault is found with the plaintiff's entire course of conduct since it was based upon an honest effort to avoid the payment of the tax which it was evident it would have to pay on June 21, 1932, unless it disposed of these stocks of gasoline and oils. There is no· question of fraud involved; there is no question of dishonesty. There is nothing in the transaction as conducted by the plaintiff that could discredit it in any manner. In fact, it exhibited its good faith by submitting this entire transaction to the Commissioner of Internal Revenue as early as December, 1933, and after disclosing all of the facts in the case to the Commissioner, the Commissioner was of the opinion that the sales were bona fide and that the stocks were not taxable. The right of the Commissioner of Internal Revenue to change his opinion from time to time is a recognized legal right and that right does not exist merely as a result of long custom, but it is a right which has been recognized by the courts almost without exception.

This court is conscious of the fact that the disposition of this case involves a large sum of money, but it also involves equitable principles, and practices between corporations and their wholly owned subsidiaries which deserve the highest scrutiny, and as said by Mr. Justice Holmes in Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 50 S. Ct. 169, 170, 74 L.Ed. 504: "The only purpose of the vendor here was to escape taxation. It was not taxed in Louisiana and hoped not to be in Mississippi. The fact that it desired to evade the law, as it is called, is immaterial, because the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it. Bullen v. Wisconsin, 240 U.S. 625, 630, 631, 36 S.Ct. 473, 60 L. Ed. 830."

The court is therefore of the opinion that, while the proceedings with reference to the purported sale on June 20, 1932, were conducted by the plaintiff in good faith, and while the plaintiff attempted to comply with the necessary requirements to make the transactions legal and bona fide, the transactions did not constitute a bona fide sale and that the wholly owned subsidiary corporations were utilized by the plaintiff as mere instrumentalities for the purpose of avoiding an imminent tax.

Judgment will be rendered for the defendant. An exception is allowed. Findings of fact, conclusions of law and a form of judgment, consistent with this opinion, may be submitted within fifteen days from this date.